RECTOR *v.* ASHLEY.

1. Where a case is brought here by a writ of error to a State court under the 25th section of the Judiciary Act, this court can only review the decision of the State court on the question or questions mentioned in that section.

2 Therefore, if .in addition to the decision of the State court on such question or questions, that court has rested its judgment on some point in the case not within the purview of that section, and that point is broad enough to sustain the judgment, then, although the ruling of the State court might be reversed on the point which is of Federal cognizance, this court will not entertain jurisdiction of the case.

3. In the present case it appeared by the *opinion* of the Supreme Court of a State, that the statute of limitations was one of the grounds on which the appellant's case had been dismissed. This, if fairly in the record, was a sufficient ground for such dismissal, and was not subject to review here.

4. But the *opinions* of the State courts (even though required by a statute of the State to be filed among the papers of the case), constituting no part of the record of the cause in which they are given (as the court here decided that they did not), nor being to be looked to for the question decided by those courts, and neither the pleadings in the case nor any other part of the record having raised the question of the statute, this court would not presume that it was in the case.

5. An appellant's title having been dependent on an act of Congress, and the judgment of the State court having been adverse to the claim set up by him under that act, the case comes within the purview of the section of the Judiciary Act before referred to.

6. In perfecting a title to land located under the act of February 17th, 1815, for the benefit of the inhabitants of New Madrid, no vested interest in the land, nor any appropriation of it binding on the United States, was effected until after the survey was made and returned into the office of the recorder of land titles.

ERROR to the Supreme Court of Arkansas; the question in the court below being the validity of a title set up by Ashley's executors on bill to a piece of land in that State, south of the Arkansas River, near Little Rock, as against a title set up on the other hand by Rector on cross-bill, each party seeking to have his title quieted as against the other.

The title of the respective parties was thus:

Ashley claimed under a certain act of Congress of June 23d, 1836,* granting to the State of Arkansas, for the purpose of completing the public buildings at Little Rock, a quantity of land, not exceeding five sections, to be located under the authority of the General Assembly of that State, on any of the *unappropriated* lands of the United States in Arkansas. Such proceedings were had under this act, that on the *8th day* of June, 1838, the legal title to the land in controversy became vested in Ashley, unless it had been previously *appropriated* by virtue of the proceedings under a certain act of Congress of February 17th, 1815, through which

---

* 5 Stat. at Large, 58.

Rector set up a prior equitable ownership of the same land. This last-mentioned act provided that any person owning lands in the county of New Madrid, in Missouri (then recently visited by earthquakes), and whose lands had been materially injured by them, should be authorized to locate the like quantity of land on any of the public lands of the said territory, the sale of which was authorized by law, not exceeding six hundred and forty acres.

The material facts relating to the title of Rector thus set up, as far as they were disclosed by the record, were these: On the 30th November, 1815, there was issued to Henry Cockerham, by Frederick Bates, recorder of land titles at St. Louis, a certificate of the loss of six hundred and forty acres of land by the earthquake, entitling him to locate the same quantity on any of the public lands of the Territory of Missouri, the sale of which was authorized by law. Next in order was a paper signed by William O'Hara, directed to the surveyor of the lands of the United States for the States of Illinois and Missouri, and the Territory of Arkansas, referring to this certificate, and stating that the said O'Hara, as the legal representative of Cockerham, located the said six hundred and forty acres on the south side of the Arkansas River, near Little Rock; describing the location so as to enable the surveyor to identify it, and praying an order of survey. This paper was dated St. Louis, October 30th, 1820, but no evidence was given that it was ever filed in the surveyor's office, nor any to show from whence it was produced; though for the purpose of the opinion given by it, this court considered that it might be conceded that it was regularly filed in the surveyor's office at the time it bore date, and that O'Hara had authority to act as the representative of Cockerham in the matter.

Then followed in the record, a survey purporting to be made under Cockerham's certificate, dated May 30th, 1838, and this was certified on the 16th day of June, 1838, to be then on file in his office, by F. R. Conway, recorder of land titles at St. Louis; and he further certified that by virtue thereof, the said Cockerham, or his legal representa-

tive, was entitled to a patent for the tract so surveyed, amounting to six hundred and forty acres of land. This appeared to be a transcript from the records of the General Land Office. There was also, in another part of the record, a survey dated May 2d, 1839, purporting to be made under the same certificate, apparently not identical with the former survey, and which was certified to be a copy from the records of the surveyor of public lands for the district of Arkansas. There was nothing to show whether this survey was ever filed in the office of the recorder of land titles or not. It was understood that the description in the order of O'Hara to the surveyor, and the first of these surveys, and probably the second also, covered the land in dispute.

It was this title thus set up under the act of 1815 which Rector sought to have quieted and confirmed by his cross-bill. In the *pleadings* the titles were rested on the two acts of Congress respectively; though in the original bill in support of Ashley's title, filed by his executrix and one Beebe, it was averred, after a full statement of the title derived under the act of 1836—which title alone was set forth as the substantive ground of Ashley's bill—that Rector had " never had anything more than temporary actual possession or occupation " of any part of the said lands " alleged to have been located by virtue of the said pretended New Madrid location, except," &c.; while it was stated on the other hand that Ashley and his representatives " have continuously had actual and constructive possession of the same." Beyond this the pleadings showed no reference to possession and lapse of time as an element of title.

The Supreme Court of Arkansas decided the case in favor of Ashley, giving a learned opinion (which was now in print before this court, but forming no part of the record sent up), to the effect that the land had not been "appropriated" until after Ashley's title was fixed, and going also into an argument to show that under the statute of limitations of the State of Arkansas, Rector was barred by lapse of time. By a statute of Arkansas the opinions of the court are required to be filed among the papers of the case. Judgment

was accordingly given in favor of Ashley's executors, and the case was now here under the twenty-fifth section of the Judiciary Act, which declares that a final decree of the highest court of a State, where is drawn in question the construction of any statute of the United States, and the decision is against the title, right or privilege so set up, may be reviewed here.

The two questions here were, 1st, jurisdiction; 2d, the validity of the claim of Rector.

*Messrs. Martin, Rose, and Watkins, for Ashley's heirs, the defendants in error,* contended—

1. That this court could not entertain the case under the 25th section, and that it ought in fact be dismissed for want of jurisdiction, since it was plain that the question of title under the statute of limitations was passed on by the court below, whose opinion the statutes of Arkansas required to be filed among the papers of the case, and which was so made, the counsel argued, part of the record; and was in fact, also, presented sufficiently even by the record proper, in which reliance was had on continuous " actual and constructive possession;" and that this court, therefore, was not competent under the section named to review a decision on the State statute, which decision was to be taken as certainly correct.

2. As regarded the claim of Rector, that on the facts of the case, it appeared that the land had been appropriated to Ashley on the 8th June, 1838, before any pretence of title appeared in Rector; which at earliest was 16th of the same month. Among other cases, *Lessieur* v. *Price* in this court* was in point. There the court held that a return of the survey to the office of the recorder was necessary to make an appropriation, and to give the title.

*Messrs. Reverdy Johnson, Bradley, Sr., and A. H. Garland, for Rector, plaintiff in error, contra,* argued—

1. That the court could look to the record alone, where no

---

* 12 Howard, 60.

title was set up by limitations, and where, notwithstanding a few words in the bill by Ashley's executors about possession, it could not be said that such a defence was even ad-umbrated.

2. That in *Lessieur* v. *Price*, cited on the other side, the title spoken of by the court was the legal title, not the equitable one; that here Rector had obtained an equitable title which the United States could not devest; that Congressional surveys had been extended over the land when it was claimed by O'Hara, and so no further survey was necessary.

Mr. Justice MILLER delivered the opinion of the court.

The first question presented grows out of a denial of the jurisdiction of this court by defendants in error.

It is conceded that one of the points decided in the Supreme Court of that State against the plaintiff in error would be a sufficient ground for the jurisdiction, if it were the only one on which that court decided the case; but it is claimed that the decree is also based on another and distinct ground, over which this court has no jurisdiction, and that, therefore, we cannot examine the first point. If there *is* this second ground on which the decree may still be supported, although the first were decided in favor of the plaintiff in error, it would be a useless labor to inquire into the correctness of the point which is of Federal cognizance; because, as the ruling of the State court must be assumed to be correct on the other proposition, no reversal could follow if that proposition was sufficiently broad to sustain the decree.

It is claimed that the statute of limitations of the State of Arkansas is made by the Supreme Court a distinct ground for dismissing the cross-bill of Rector. If this be found by the record to be true, it is undoubtedly sufficient in itself to sustain the decree, and is beyond the revisory power of this court. But a careful examination of the pleadings in the case has not enabled us to discover that any of the parties, in whose favor the decree was rendered, have distinctly set up the bar of that statute, as a defence to the relief claimed by Rector. It is true that there is a casual reference in the

original bill of Ashley's executrix and Beebe, to their actual
and constructive possession, but it seems used rather argu-
mentatively in favor of their title than as setting forth a dis-
tinct ground of relief; and in their answer, and in all the
other answers to Rector's cross-bill—the bill which sets up
the main title in controversy—nothing is said of the pos-
session of defendants.

We cannot see, then, either from the pleadings or from
any decree in the case, that this question was raised or con-
sidered by the court.

But the opinion of the Supreme Court of Arkansas is pro-
duced, and in that it is stated that the defendants are pro-
tected by the statute, and this is given as one of the reasons
for the decree rendered.

We have of late been frequently urged, in this class of
cases, to look into the opinions delivered in the State courts,
to ascertain on what grounds their judgments were based;
and the point has been one of some controversy. It is not,
however, an open question. More than forty years ago the
same question arose in the case of *Williams* v. *Norris*, re-
ported in 12 Wheaton.* The proposition was pressed upon
the court for the same reason that it is in this case, namely,
that by the statute of the State the opinions of the court are
required to be filed in writing among the papers of the case.
Marshall, C. J., speaking for the court, held that, notwith-
standing this act, the opinion of the State court constituted
no part of the record, and could not be looked to as the
foundation on which this court would take or refuse juris-
diction.

Leaving out the opinion of the State court, there is noth-
ing in the record before us to show that its decree decided
any other controverted proposition than the validity of the
title set up by complainant, Rector. This title was depend-
ent upon the act of Congress of February 17th, 1815, for the
relief of the inhabitants of New Madrid, who had suffered
by earthquakes, and the decision was against the claim set

* Page 117.

up by him under that statute.   It is, therefore, a proper case for a writ of error under the twenty-fifth section of the Judiciary Act.

2. As respects then the claim of Rector, who seeks to have his title quieted by the cross-bill which he has filed.   The validity of this claim is the point to be decided by this court.

[His honor here stated the facts and proceedings on which the claim of Rector rested, as already given, and proceeded:]

The questions to be considered on these facts are, did these proceedings establish a right in the parties who represent Cockerham, to the land covered by the survey, which would withdraw it from the category of *unappropriated* lands on which the Arkansas grant could be located?   And if they did, at what point in the proceeding did this right become fixed?

It seems to us that this court has already settled these questions in a manner which leaves nothing more to be said, unless we overrule its decisions.

In the case of *Bagnell* v. *Broderick*,* which raised a question concerning a title derived under the New Madrid act, the court, after describing the proceeding necessary to secure its benefit, says: " The United States never deemed the land appropriated until the survey was returned " (to the recorder of land titles), " for the reason that there were many titles and claims, perfect and incipient, emanating from the provincial governments of France and Spain, and others from the United States, in the land district where the New Madrid claims were subject to be located.   So there were lead mines and salt springs excluded from entry."   Again, speaking of an act of the legislature of Missouri, which authorized an action of ejectment on a New Madrid location; it is further said : " Our opinion is, first, that the location referred to in the act, is the plat and certificate of survey *returned to the recorder of land titles*, because by the laws of the United States this is deemed the first appropriation of the land, and the legislature of Missouri had no power, had it made the attempt, to declare the notice of location filed with the sur-

* 13 Peters, 436.

veyor-general, an appropriation contrary to the laws of the United States."

In *Barry* v. *Gamble*,* the court says: "By the certificate of the recorder of land titles at St. Louis, Lafleur was entitled to 640 acres of land in compensation for lands of his injured by the earthquake in New Madrid County. On this the survey of 1815 is founded. *Its return by the surveyor,* with a notice of location, *to the office of the recorder, was the first appropriation of the land.*"

The case of *Lessieur* v. *Price*,† is not distinguishable from the one before us. In that case, as in this, plaintiff claimed under a New Madrid certificate, and the defendant under an act granting to Missouri four sections of land to aid in erecting public buildings, as the defendant in this case claims under a similar act for the benefit of the State of Arkansas. The case there, as it does here, turned upon the question which party first made a valid appropriation of the land in dispute. The court there declares that, for this purpose, the location under the New Madrid act must be an appropriation of the land, and its acquisition by the locator, with corresponding right to possess and enjoy it as against the United States; and the inquiry arose, what acts were required on the part of the locator to devest the United States of title? After reciting the language of the act on which this question is declared to depend, the court proceeds: "The notice of location in this instance was delivered to the surveyor-general, June 2d, 1821, for the land in dispute, and is claimed as the inception of title, and location in fact, within the meaning of the State law authorizing ejectments on New Madrid locations. That it was the mere act of the party, not having the assent of the government, must be admitted. The act of Congress provides ' that in every case where such location shall be made according to the provisions of this act, the title of the person or persons to the land injured shall revert to and become absolutely vested in the United States.' A concurrent vestiture of title must have occurred. The injured land must have vested in the United States at the

---

* 3 Howard, 32.         † 12 Id. 60.

same time that the title was taken by the new location. It was intended to be an exchange between the parties, and the question arises, when did the United States take title?" After further consideration of the relative duties of the recorder of land titles, and of the surveyor, under the act of 1815, the court again rules that the return of the survey to the office of the recorder is essential to the appropriation of the land.

We are much pressed in the present case with the argument that the title here spoken of by the court, is the legal and not the equitable title; and that inasmuch as the applicant has done all that he can do, to make good his claim to the land, when he has deposited with the surveyor his certificate of loss, with a description of the land desired in exchange, he has thus acquired an equitable interest in the land so described, which the United States cannot devest by giving it to another.

But the rights of claimant are to be measured by the act of Congress, and not exclusively by what he may or may not be able to do; and if a sound construction of that act shows that he acquires no vested interest in the land until the officers of the government have surveyed the land, and until that survey is filed in the office of the recorder, and approved by him; then as claimant's rights are created by that statute, they must be governed by its provisions, whether they be hard or lenient. It seems to us clear, from the foregoing cases, that the court intended to decide, that until this was done the claimant acquired no vested right to the land; no title, legal or equitable. It is evident that in the case of *Lessieur* v. *Price*, the court is not speaking of the legal title. The statute of 1815 required a patent to be issued on the return of the survey to the recorder's office. The strict legal title remained in the United States until the patent issued; and the court could not have referred to that.

On the contrary, it is obvious that the court was endeavoring to fix the point in the proceedings, when the right of the claimant became vested, when his equity became a fixed fact, when the land he sought was appropriated to him, and

when his injured land became the property of the United
States; and by each of the three decisions we have cited
this is held to be when the survey is returned to the office
of the recorder of land titles. The legal title conveyed by
the patent may not issue for years afterward, but by the act
of the legislature of Missouri, an action of ejectment could
be maintained on the equitable title thus acquired. • In the
Federal courts, however, according to repeated decisions,
this could not be done for want of the legal title.

These views must dispose of the present case. The title
of Ashley became a full vested legal title on the 8th day of
June, 1838.

The earliest evidence we have of the return of the survey,
under Cockerham's certificate, to the recorder of land titles,
is the certificate of that officer of the 16th of June, 1838.
The land, therefore, was *unappropriated* within the meaning
of the act for the benefit of the State of Arkansas, when
Ashley acquired title according to its provisions.

It is said that the Congressional surveys had been extended
over the land in dispute when they were claimed by O'Hara,
and described in his application to the surveyor, and that,
therefore, no other survey was necessary. It is not impor-
tant to decide here whether this would obviate the necessity
of a survey, or of some equivalent return to the recorder's
office, to show what land was intended to be appropriated
under the certificate of loss, which emanated from that
officer; for the description of O'Hara, while it refers to cer-
tain legal subdivisions of the public lands, refers also to other
claims located in the same subdivisions, in such a manner
that it can be ascertained only by a survey, how much and
what parts of these legal subdivisions are necessary to make
up his six hundred and forty acres. Such seems to have
been his own opinion, when he prayed for an order of sur-
vey. It was undoubtedly necessary to an identification of
the land.

The decree of the Supreme Court of Arkansas, having
been made in conformity to these principles, is

AFFIRMED.