Mr. Justice CATRON
delivered the opinion of the court.
Tim first question in order is, whether ;the patent to Lafleur is a valid title as die United. Státec, when standing aloné.
"By the the recorder of land-titles-at St. Louis,Lafleur was entitled to 640 acres of-land in compensation for lands of his injured, by the earthquake' in New Madrid county. ■ On this, the survey of April, 1815, is founded. Its.retum by the surveyor, with notice of location, to the 'office of thé recorder, was the first appropriation of -the land; and not the "notice to the surveyor-general’s office.requesting the survey to be made, as this-court held in Bagnell v. Broderick, 13 Peters, 450.
Township 45, in which the land granted to Lafleur lies, was laid off into sections in 1817, and 1818; and we-suppose before the survey for Lafleur-was .made,' as his patent, and the.survey .on which the patent is founded both refer to the township by number as including the land. . When the return of the township-survey was made to the surveyor-general’s office does not distinctly appear, although it is. probable it was after Lafleur’s location had been made with the recorder. •
The location was in irregular form, and altogether disregarded.the *52 section lines, and ordinary- modes of entry under'the laws of the United States. ' This circumstance lies at the bottom of the controversy. The general land-office at Washington refused to issue a patent on New'Madrid locations thus surveyed.: The secretary of-the Treasury on the 11th of May, 1820, and. again on the 19th of June, 1820, called on the attorney-general' for his opinion on the validity of such locations, (2 Land-Laws-and Opinions, 9, 10,) this officer replied — “That the authority given is,to make these loca--tions on any of the public lands of the territory, the sale of which is authorized by law; but the sale is not authorized by law until the sectional lines are run, and- consequently all locations previously made by these sufferers are unauthorized.”
To cure this defect, the act of 1822 was passed, whifh provides, that locations made before that time, under the -act of 1815, if made in pursuance of the act in other respects, should be perfected into grants in like manner as if they had conformed to thé sectional and quarter-sectional lines of the public surveys; and -.that the fractions previously created by such locations should be deemed legal ■ fractions, subject to sale: But that after the passing of the act, (26th April, 1822,) no location of a New Madrid claim should be permitted that did not conform to' the sectional and quarter-sectional lines. The opinion of the attorney-general appears to have (been favourable to locations in conformity to the public surveys actually made, before their return; until returned however, and received at the surveyor-general’s office, they could not be recognised as legal public surveys; and in this sense Congress obviously acted- on the opinion,' and course of the general land-office, in pursuance of it. .
The principal difficulties standing in the way of issuing patents, seem to have been the following: There were New Madrid locations made on lands not then surveyed; locations made after the lands had been surveyed, but before the surveys were returned; and loca.tions made on lands surveyed,- and the surveys -returned; in each case, disregardful of the section lines. But all of them'were on lands that had been surveyed, and the- surveys duly returned and sanctioned, when the act of-1822 was passed. - On- this state of facts Congress acted. No distinction was made among the claimants; all fractions created .by prior locations, in existing public surveys, were declared-legal, and subject to sale; the fractions produced, could not be legal unless the locations producing them were equally so: In this respect, therefore, such locations were binding on the United States from the date of the act. It is insisted, however, that until section Not 45 had been offered for sale by the proclamation of the President, ño entry could be made on it by a New Madrid warrant; and in this respect Lafleur’s location was void before,- and not •cured by, the act of 1822, but expressly .excepted: that Congress only acted on one defect, that of disregarding the sectional lines,and exclud- ' ed all others. Township No. 45 was first advertised for sale in 1823.
*53 In addition to what has been said in answer to the. argument, .it may be remarked, that- the New Madrid, sufferers were preferred claimants; like others having a legal preference, they had a right'to buy, so soon as'the officers of the government had by law the power to sell; and sales could be made founded on public surveys. It ■ could, not have been intended by Congress that the sufferer should surrender his injured claim, get his warránt from, the recorder, and then be compelled to wait--until after the public sale, which might sweep all the lands out of which he could obtain a new home. And. so the act of 1815 was construed and acted on at the general land-office. No objection seems to have been made there on the groundr that these claims had been entered on lands not previously, ofiéréd fór sale at auction; as the President might, or might not order the sale. We think this plainly inferrible from the following order. On the 9th of April, T818, an act was passed limiting applications to the recorder, for New Madrid warrants of survey, to the 1st of January, 1819. The commissioner of the land-office here,, wrote to the recorder at St. Louis, enclosing a copy of .the act, a few days after it was passed, saying:
“ This act authorizes the reception of claims'to the 1st of January next; but as several public sales will take place previous to that day,you must not issue any.patent certificates tó those claimants after the commencement of such sales, unless the claimant produces a certificate from the register of the land-office to show that the land has not been sold. Should you issue any patent certificate to those claimants previous to the public sales, you will furnish the register of the land-office for the district in which the lands lie with a list of the tracts .for which you have issued patent certificates, that he may., reserve them from sale.”
The 3d section of the act of 1815 makes it the duty of the recorder to deliver to the claimant a certificate stating the circumstances of the. case; .that is, that the claim had been allowed, surveyed, and recorded in due form, and that he was entitled'to a patent for the tract designated: this was to be filed with the recorder if satisfactory to the claimant. Then the recorder was bound to issue the “ patent certificate,” above spoken of, in favour of the party, which, being trans-. mitted to the commissioner of the general land-office, entitled the claimant to a patent from the United States.
By. the foregoing instructions, patent certificates, previous to the public sales, were contemplated as due to claimants for lands entered but not previously offered.for sale; and we cannot doubt did existr in large numbers. They, of course, were sanctioned at the land-office. Nor is-the consideration of this question presented to this court for the first time. Pettier’s claim, in the case of Stoddard v. Chambers, 2 How. R. 317, was like this in all its features except one. It had been located on the same land covered by Bell’s concession made by the Spanish government, which had been filed-and *54 recorded jn 1808, but not recommended for confirmation by the commissioners at St.-Louis,'for want of occupation and cultivation. By the act of 1811, until the decision of Congress was had, the land covered by the Spanish claim could not be offered for sale, and this restriction was continued. Pettier’s New Madrid location was made in 1818, on the land reserved from sale in favour of Bell’s.concession, and this court held the Néw Madrid locatioh, and the patent founded on it, void, because the sale of the land “ was not authorized by law,” and the title of Pettier in violation of the act of 1815. But the cofirt says: — “ Had the entry been made or the patent issued after the 20th of May, 1820, when the reservation ceased, and before jt was revived, by the act .of 1832, the title of the. defendant could not be contested;”
' For the reasons assigned, the court was of opinion Pettier’s claim would have been valid, had Stoddard’s not been interposed. It also lies in township No. 45.- So our opinion is, that Lafleur’s claim was rendered valid by the act of 1822, unless it can be overthrown by the interpoátion of Mackay’s.
■ 2. This raises the inquiry into its validity in opposition to Lafleur’s. That, standing alone, Mackay’s. was valid against the United States, is in effect, decided by this court in Pollard v. Kibbe, 14 Peters, 355, and Pollard v. Files, 2 How. 601, and is free from doubt.
Lafleur’s location-was made in 1818, and his patent 1827. Mackay’s claim was first fifed for adjudication before the District Court (U.'S.) of Missouri in Í829. Up to this date it had stood as an incomplete claim, requiring confirmation by this government before the title could pass from the United States; to accomplish which a decree in its favour was sought in the District Court, and finally obtained here on appeal; in conformity to which a patent was obtained.
As the proceeding under the act of 1824 was ex parte, Lafleur was not bound by it any further than the legislation of Congress af-. fected’ his rights; and’the questiontis, how far were they protected, as against' incomplete titles brought before the District Court.
By the act of March 2d, 18Ó5, sec, 4, certain French and Spanish claimants were directed, on or before the 1st day of March, 1806, to deliver to the register of .the land-office, or recorder of land-titles, within whose district the land might lie, every grant, order of survey, deed, conveyance, or other written evidence of claim, to be recorded in books kept for the purpose. “And if,” says the act, “such person shall neglect .to deliver such notice in. writing of his claim, or cause to be recorded such written evidence, of the same, all his right, so far as the same is derived from the two first sections of this act¿ shall become void, and &r ever thereafter be barred; nor shall any incomplete-grant, warrant, order of-survey, deed of conveyance, or other written' evidence, which shall not be recorded as above directed,- ever after be considered or admitted as .evidence, in any *55 court of the United States, against any grant derived/rom the United States.”
, By the act of April 21, 1806, sec. 3, supplemental to the act of 1805, the time for filing notices of claims and the evidence thereof, was exténded to the first day of January, 1807: but the rights of such persons as shall neglect so doing within the time limited by the act, it, was declared should be barred, and the evidence of their claims never after be admitted as evidence; in the same manner as had been provided by the 4th section of the act to which that was a supplement.
By the 5th section of the act of March 3, 1807, further time fpr filing notices and evidences.of claims was given till the 1st day of July, 1808: But all benefit was cut off from the claimant, if he failed to give .notice of his claim; and- file his title papers; so far as the acts .of Congress operated in giving the title any sanction through the agency of commissioners — arid ever after the first of July, 1808, the claim was barred.
It is insisted, however, Mackay’s claim is not embraced by the act of 1805, and- to which the acts of 1806 and 1807 refer. The act of 1805 does govern the future legislation, interposing a. bar. By section 4,. French or Spanish grants made and completed before the 1st day of October, 1800, might, or might not, be filed; as the treaty of 1803 confirmed them, they needed no further aid: But complete grants issued after the 1st- day of October, 1800 — and incomplete titles, beating date after that time, “ shall be filed,” says the act. Mackay’s claim is of neither description; it was an incomplete tide'; - being a permit to settle and warrant of survey, without any settlement or survey having been made; but dated before the 1st of October,-1800.
The act of 1805, section 4, further provides, that every person claiming lands by virtue of the two 'first sections of that act, should, by the 1st day of March, 1806, file his notice of claim, title papers, &c., otherwise the claim should be barred. Mackay’s claim “ was á duly registered warrant of survey,” within the words of the 1st section of the act. That' the United States had the power to pass such' a law wé think free from doubt; it being analogous to an ordinary act of limitation, as this court held in Strother v. Lucas, 12 Peters, 448, to which nothing need be added here.
As to the United States, and - all persons claiming under them, Mackay’s claim stood barred from the 1st of July, 1808, until the passing of the act of May 26, 1824, by which the bar was removed so far as the government was concerned. The time for filing claims under this uct was extended by another passed in 1826, and again by that of May 24,1828, to the 26th day of May, 1829; béfore.the expiration of which time Mackay’s claim was filed in the District Court -(U. S.) of Missouri, and,eventually confirmed in this court on appeal: And the question is, did the acts of 1824, and 1828, and. *56 the proceeding had under them, affect Lafleur’s title. _ By the 11th section of the- act of 18¿4, it is provided* “ That if in any case it shall so happen, that the lands, tenements, or hereditaments decreed to any claimant under the provisions of this act, , shall have been sold by the United States, or otherwise disposed of, it shall be lawful for the party interested to enter the like quantity of lands, in parcels conformable to sectional divisions and sub-divisions, in any. land-office in the state of Missouri.”
The act of 1828, to continue in force the act of 1824 for a limited time, and to amend the same, declares (in section 2) — “ That the confirmations had by virtue of said act, and the‘patents issued thereon, shall operate only as a relinquishment of title,on part of the United States, and shall no wise affect the right or title, either in law or equity, of adverse claimants of the same land.”
The foregoing are the conditions on which the bar was removed; these Congress certainly had right to impose, and thereby give a preference to an intervening title acquired during the existence of the bar.
Lafleur.was a claimant with a good tide in equity,.when. the act of 1824 was passed; this he well might perfect into a patent, as hjs equity Was expressly protected by the-act of 1828, and by implication in that of- 1824, (section 11;) neither the patent or entry was affected by the proceedings had on Mackay’s- claim in'fhe District Court of Missouri, and in this court; nor by his patent issued pursuant thereto :■ It follows Lafleur’s is the better title, and that the decision of-the Supreme Court of Missouri must be affirmed.