Nott, J.,
delivered the opinion of the court:
These five actions are suits in equity, brought under the Hot Springs Act June 11, 1870, (16 Stat. L., 149,) to determine the conflicting claims of the parties claimant and of the United States as defendants to the Hot Springs of Arkansas. As each of the suits was adverse to the others, the parties seeking to recover the same property by different and conflicting titles, *346 the court, pursuant to an authority expressly vested in it by the act, consolidated the suits, to the end that the conflicting rights of the claimants, both as against each other and the United States, may be settled by single decree.
The property which is the subject of dispute is, as has been said, the Hot Springs of Arkansas, but the suits of the parties are not all directed to precisely the same tract of land. Some of the parties seek to recover a square tract of two hundred arpents, whereof the Hot Springs form the center, and others ■seek to recover a single quarter-section, as laid down on the public surveys. But a corner of the quarter-section overlaps and includes a portion of the two hundred arpents, and the Hot ■Springs, which constitute the real value of the property, lie within the overlapping corner. It is to be understood that if the title of one of the parties to the quarter-section is valid, the ■others may still be entitled to the remainder of the two hun>dred arpents, and conversely that, if another has the better title to the whole of the two hundred arpents, the former may still be entitled to the remainder of the quarter-section; but inasmuch as the right to the Hot Springs is the only subject of dispute, we will, for convenience and brevity, speak of them as though they constituted the exclusive ground of controversy.
Though there are five parties claimant before the court, nevertheless, so far as the defendants are concerned, there are but three adverse titles asserted, for three of the parties seek to recover upon the same title, and the superior equity of any one of them as against the others is a matter of indifference to the defendants. As all of these titles flow from the same source— the Government — it is evident that that one which is first in time will, if it be valid, extinguish the claims which come after it.
I. The first, known as the Percifull title, is founded on the Pre-emption Act April 12, 1814, (3 Stat. L., p. 121, § 5,) and the prior inhabitancy and cultivation of the tract by John Per-cifull. It is represented in this case by the claimant Hale.
II. The second, known as the Bector title, is founded on the New Madrid Act February 17, 1815, (3 Stat. L., 211,) and the location of what was known as a New Madrid certificate by ■Samuel Hammond and Elias Bector in 1820. This title is represented, respectively, by the claimants, (1) Bector, (2) McKay and Gitt, and (3) Bussell.
*347 III. The third, known as the Belding title, is founded on the Pre-emption Act May 29, 1830, (4 Stat. L., 420,) and the actual possession and cultivation of the tract in that year and on that day by Ludovicus Belding. It is represented in this suit by the claimants Gaines et al.
Chronologically arranged, the principal conflicting acts of the parties (including those of the Government) which affect, these titles appear in the following order:
In 1812, the Hot Springs of Arkansas, though in a remote and unsettled portion of the country, approachable only by a bridle-road or foot-path, were to all intents and purposes a summer health-resort. Invalids went there annually to the number of twenty or thirty, erected temporary shelter, popularly termed u camps,” obtained the benefit of the waters during the summer, and returned to their homes with the autumn. The situation of the. springs is in a deep ravine, surrounded by a barren country, and in the tracts which are the subject of dispute there was not more than an acre and a half of ground susceptible of cultivation.
In 1813 John Percifull, as his representatives allege, built the first house at the springs. The fact of his occupancy is not so much disputed as its character, for it is asserted that he did not inhabit and cultivate, within the true intent and meaning of the statute under which they claim. The principal point of the objection is that his residence was some miles distant from there, and that he came to the springs during the summer to sell supplies to the invalid visitors; that they presented him with their camps; that he raised a few vegetables to vend to them; and that he gradually acquired some buildings without inhabiting and cultivating, as required by the statute under which their claims must be adjudged;
In 1814 Congress passed the Pre-emption Act, April 12, 1814, (3 Stat. L., 121,) which provides “ that every person and the legal representatives of every person ivho has actually inhabited and cultivated a tract of land,” &c., “ shall he entitled to the right of pre-emption in the purchase thereof.”
In 1815 Congress passed the Few Madrid Act, February 17, 1816, (3 Stat. L., 211,) which .provides that “persons whose lands have been materially injured by earthquakes shall be, and they are hereby, authorized to locate the like quantity of land on any of the public lands of the said Territory the sale of which is authprized *348 by law.” The act also provides for the ascertainment of this fact by the recorder of land-titles, for the issuauce of a certificate by him entitling the holder to locate upon other public lands, for the location under this certificate, on the application of the claimant, by the principal deputy surveyor for the Territory, for a return of the plat and location to the recorder of land-titles, and for the issuance of a certificate, and then of another or final certificate of location by him to the party.
In 1816 Congress passed the Act April 29, 1816, (3 Stat. L., 325,) creating a new office, subsequently known as that of surveyor-general.
In 1818 the Indian title to this part of the Territory was extinguished by the Qaapaw treaty, 2-ith August, (7 Stat. L., 176.)
In 1818 a New Madrid certificate, dated 26th November, and numbered 467, was issued by the recorder, for two hundred arpents of land, in favor of Francis Langlois, and delivered to Joseph Storey, as attorney and assignee. On the 29th November of the same year Francis Langlois, by Joseph Storey, released and assigned this certificate to Samuel Hammond, and he in turn assigned one-half interest therein to Elias Eector on the 19th February, 1819.
In 1819 Hammond and Eector filed their application, dated 27th January, 1819, under their New Madrid certificate, for the entry, of two hundred arpents of land, “to be su,rveyed in a square tract, the lines of which to be corresponding icith the cardinal points, and to include the Sot Springs11 the said springs to be as near to the center of the sguare as circumstances will admit.”
In 1820 the Attorney-General and Secretary of the Treasury decided that locations of New Madrid warrants could only be made upon public lands which had been surveyed and offered for sale, and that the locations must conform to the sectional lines of the public surveys. Instructions to this effect were issued to the officers of the Land-Office.
In 1820 James S. Conway, deputy surveyor, returned and filed his survey No. 2903 and plat of the location of Hammond and Eector’s warrant in the office of the surveyor-general at Saint Louis. The character of this survey and the fact of this filing- and of the approval thereof by the surveyor-general are contested by the other parties.
In 1822 Congress passed'the Act April 26, (3 Stat. L., 668,) *349 which, provided that the location theretofore made of warrants “issued under the New Madrid Act, if made in pursuemee of that act in other respects, shall he perfected into grants in lihe manner as if they had conformed to the sectional or quarter-sectional Unes of the public surveys.” The act also provided that all such warrant s “shall be located within one year after the passage of this act, in failing tohereof the same shall be null and void.1” It was subsequently provided by the Act March 2,1827, “ that the location of lands heretofore made according to law” “shall be perfected into grants in the manner prescribed” by the Neto Madrid Act, “any construction thereof to the contrary notwithstanding.
In 1829 Ludovicus Belding occupied a house and cultivated a small plot of land as a garden at the Hot Springs. The house was owned by Percifull, and Belding entered it as his tenant. Other persons at the same time occupied other houses and resided at the springs. The fact of his occupancy and cultivation are hardly questioned, but the character and sufficiency is a matter in dispute. He continued to occupy and cultivate until after the 29th of May, 1830.
In 1830 Congress passed the Act May 29, (4 Stat. L., 420.) It provides “that every settler or occupant of the public lands prior to the passage of this act, who is noto in possession, and cultivated any part thereof in the year 1829, shall be, and he is hereby, authorized to enter with the register,” &c., “ a quarter section.” It also provides “ that the right of pre-emption contemplated by this pet” shall not “extend to any land which is reserved from sale by act of Congress,” &c., “and that this act shall be and remain in force for one year from and after its passage.”
In 1832 Congress passed the Act April 20) (4 Stat. L., 505,) which provides that the Hot Springs “shall be reserved for the future disposal of the United States, and shall not be entered, located, or appropriated for any other purpose whatever.”
In 1832 the same Congress passed the Act July 14, (id., 603,) providing that persons entitled to pre-emption under the act of 1830, who had not made proof and entered the same within the time limited in that act, “in consequence of the public surveys not having been made and returned,” &c., “shall be permitted to enter the said lands, on the same conditions in every respect as are prescribed in said act, within one year after the surveys are made.”
The act was also further extended by the Act Juye 19,1834, (4 Stat. L., 678,) and by the Act June 22,1838, (5 Stat. L., 251.)
*350 In 1838 the first public surrey of or around the Hot Springs-was made, the plot thereof was certified on the 30th April, and the lands, except as reserved, were subsequently offered for-sale.
In 1838, after the public survey, the widow of Percifull sought to enter the quarter-section; but her application was refused, by the register and receiver of the land-office on the ground of a prior location made by Eector under the Hew Madrid warrant No. 167.
In 1839 the widow of Belding, after the survey, and before-the lands were offered for sale, sought to enter the quarter-section under the Act April 29,1830. The application was not finally acted upon until 1851, when an entry was allowed by the Secretary of the Interior, at the special request of the applicants, and for the special purpose of enabling them, to obtain-a foothold in'court to try the legal question then in dispute.
In 1841 Congress passed the General pre-emption Act September 4, 1841, ( 5 Stat. L., 453.)
In 1843 Congress passed the Act March 1,1843, (5 Stat. L.,. p. 603, § 3,) providing that “ everysettler of the public lands south of the Arlcansas River shall be entitled to the same benefits accruing under the provisions of the Pre-emption Act of 1814 as though, they had resided north of said river.”
In 1843 the widow of Percifull again sought to enter the-quarter-section, and tendered the purchase-money thereof, but her application was refused by the register and receiver.
In 1851 the register and receiver in Arkansas, pursuant to instructions from the General Land-Office, reported upon the claim of Belding’s heirs, agreeing substantially on the facts,, but differing in their conclusions,' the former holding that Belding’s possession was the possession of his landlord, and the latter that he had occupied and cultivated within the meaning of the Act May 29, 1830. The Secretary of the Interior, Mr. Stuart, after the Land-Office had rejected the claim, decided that it was proper and in accordance with precedent to permit the applicants to make an entry under the act, so as to place them in a position to test the adverse claims of others to the same land, the entry, nevertheless, to remain.“subject to the-same power of revision and control by the General Land-Office and this Department as may be lawfully exercised over any ordinary entry.” Under this decision the Belding heirs entered the- *351 land, paving the price thereof, and receiving the usual certificates, bearing date 19th December, 1851.
In 1860, June 7, the Secretary of the Interior, Mr. Thompson, decided that the entry authorized by his predecessor, Mr. Stuart, was contrary to law and should not have been allowed,, and he directed that it be canceled.
In 1S70 Congress passed the Hot Springs Act, referring the-controversy to this court.
For the purpose of showing the claims which the several parties present, we have analyzed from their evidence the following : v
CHAINS OE TITLE.
I. — In Hale’s Case.
The United States to John Percifull. — The pre-emption right-under act 12th of April, 1814, (3 Stat. L., p. 121, § 5.)
Under this it is claimed that Percifull inhabited and cultivated pursuant to the terms of the statute, and that his possession has been maintained till the present time; and that in. 1838, after the lands had been surveyed and before they had been offered for sale, the heirs of Percifull made proper application to pre-empt the quarter-section which is the subject of suit.
John Percifull to Sarah and David Purcifull. — By descent,,
in 1836.
By the death of John Percifull, in 1836, intestate, his equity went to his widow, Sarah, and only child, David.
Sarah and David Percifull to John C. Hale and Milus Woods.— Agreement and conveyance to John C. Hale and Milus Woods-of half interest, dated November 16,1840.
This instrument purports to sell and convey undivided one-half part of the quarter-section to Hale and Woods. Woods is. said to have sold his interest to Jacob Mitchell, and Mitchell to have sold to the claimant, Eector, but this is only shown by parol evidence. A division of the land between Hale and Woods is shown by parol evidence, and that Mitchell (and after him Eector) had been in possession of Woods’ portion, but no conveyance or sale by Woods is produced, nor is he or his representatives made a party to this suit.
*352 John C. Hale to Henry M. Rector. — Agreement, dated May 11, 1843.
This agreement conveys one-balf of Hale’s' interest in tbe property acquired under tbe preceding conveyance to him and Woods, being one-eighth of the entirety. It is in consideration of Rector’s conveying to Hale one-fourth of his interest under the New Madrid certificate; but it is claimed by Rector that certain other provisions of the agreement were never carried out, and that it was subsequently abandoned, and that under the decisions of the Supreme Court of Arkansas a sealed agreement may be abandoned without formal instrument in writing to that effect being executed.
David Percifull and Elizabeth, his wife, to John O. Hale.— Deed, dated January 10,1848.
This instrument conveys all of David Percifull’s remaining interest, being the one-half part of the quarter-section. His mother had previously died intestate, and consequently, under this and the former conveyance of Sarah and David, Hale acquired three-fourths of the property; but he conveyed one-eighth to Rector, leaving in himself five-eighths, of which he now claims to be the owner. One-eighth is supposed to be in Rector, and the remaining one-fourth of Woods’ is not represented in the suit.
II. — In Meotor’s Case.
The United States to Francis Langlois. — New Madrid certificate No. 467, dated Saint Louis, November 26,1818, under the act of, February 17,1815, (3 Stat L., 211.)
Langlois proved by Joseph Story, his attorney and assignee, to the satisfaction of Frederick Bates, recorder of land-titles at Saint Louis, that a tract of 200 arpents, situated in Bayou Saint John, in the county of Ne.w Madrid, had been injured by earthquakes. On the 26th November, 1818, the recorder issued his certificate No. 467 stating that Langlois or his legal representatives is entitled to locate 200 arpents on any of the public lands. Langlois at the same time, by Storey, his attorney, executed a release to the United States of his said injured tract on the Bayou Saint John.
*353 Francis Langlois and Barbara, his wife, to Joseph Storey.— Power of attorney, dated 10th November, 1818. — Deed, dated 12th July, 1819. — 'Consideration, $260.
Prior to the issuing of the New Madrid certificate, Langlois, “for good causes and considerations,” executed his power of attorney irrevocable, and under seal, dated 10th November 1818, to Joseph Storey, giving full power to him to locate the 200 arpents for his own proper use and that of his heirs and assigns, and with authority to relinquish and release the injured lands to the United States. Subsequently to the issue of the New Madrid certificate he and his wife again executed to Storey their deed, dated 12th July, 1819, conveying the injured lands and all the privileges and advantages arising therefrom, with a reference to the New Madrid act and with a covenant of warranty.
Joseph Storey to Samuel Hammond. — Assignment New Madrid certificate No. 467, dated January 4, 1819. — Consideration, $640.
By an indorsement on the original New Madrid certificate No. 467, bearing date January 4,1818, but undoubtedly meaning 1819, Storey assigned and transferred, for himself and as attorney of Langlois, all his title, right, and interest in' the certificate to Samuel Hammond, his heirs and assigns, and all benefits to be derived therefrom. Subsequently he executed a second assignment, bearing date the 24th Febuary, 1821, to Samuel Hammond and Elias Eector, conveying the same rights and interests.
Samuel Hammond and Eliza A., his wife, to Elias Eector.— Deed, dated February 19, 1819. — Consideration, $600.
These grantors convey by a formal deed to Elias Eector one undivided moiety of the New Madrid certificate, and of the rights and lands accruing or to accrue therefrom. The transfer of Hammond’s remaining interest is not shown directly, but-Eector, the present claimant, filed his bill in the circuit court of Arkansas for Hot Springs County against Langlois, Storey, and Hammond, and Eliza Hammond, and on 2d March, 1853, obtained a decree requiring the defendants to convey all their interest in the lands and rights under the certificate to him, *354 and the lands surveyed and selected thereunder. The defendants were served by publication; and, none of them appearing, the decree was taken by default.
Elias Rector to Henry M. Recter. — Will, dated'August 9,1822; proved August*30, 1822.
Elias Rector, by will, devised his real and personal estate to his wife for her life, with the remainder to his three children. 'At the time of his death these were of tender years. Two of them died in childhood, and the survivor, the claimant, on the death of his mother, succeeded to'all of his father’s rights and interests in the property.
Henry M. Rector to John O. Hale. — Agreement, dated 11th May, 1843.
This is the same agreement previously mentioned in Hale’s case, whereby Hale conveys to Rector one undivided eighth part of the quarter section, in consideration of Rector’s conveying to him one undivided fourth part of his interest under the New Madrid certificate; but Rector, as before stated, insists on the abandonment of this agreement, and claims to be the only party in interest, under the New Madrid certificate.
III. — In McKay & Gift’s Case.
Francis Langlois to Joseph Michel. — Deed, dated 27th July, 1805.
The claimants have set up in their petition, and offered in evidence on the trial, a deed from Langlois to Joseph Michel, executor, in 1805, conveying to Michel 200 arpents of land on the River Gayoso; but the court finds that this was a distinct tract from the 200 arpents owned by Langlois on the bayou Saint John, and excludes the deed from its consideration. The claimants also offered in evidence on the trial an agreement, dated April 8, 1805, between Langlois and Michel, whereby Langlois acknowledges the payment from Michel for his “ improvements-rights on bayou Saint John, containing the quantity of 200 arpents,” and binds himself to execute any further conveyance of the said pre-emption survey when called upon or *355 requested so to do. Michel, nevertheless, is to pay. all the expenses and trouble in obtaining .any confirmation before the board of commissioners of land-claims concerning the title to the said plantation. But, this agreement not having been set up in the claimants’ petition, the court likewise excludes it from its consideration. The claimants also read in evidence the will of Joseph Michel and the various agreements or conveyances set up in their petition; but, having failed to show any interest in Michel, the court likewise excludes all of such agreements or conveyances from its consideration.
IV. — In RusselVs Case.
Henry M. Hector to John H. Bussell. — Deed, dated 5th March, 1867.' — Consideration, 810,000.
This deed conveys and quit-claims all of Hector’s right, interest, and title, of whatever character and description, in and to the 200 arpents of land located under certificate No. 467 and survey No. 2903, to John H. Eussell, his heirs and assigns; but Eussell, on the same day, executed to Eector the following conveyance:
John H. Eussell to Henry M. Eector. — Deed, dated 5th March, 1867. — Consideration, $5,000.
This deed recites the conveyance by Eector, and acknowledges that Eector has that day paid him $5,000, in consideration of which he conveys to Eector all the lands except one-half, as to which half they are to remain joint owners, “provided that within twenty days after the adjournment of the first session of the present Fortieth Congress 1 shall have secured and shall bring and 'produce to the said Rector a confirmation, entire, full, and complete, by the Congress of the United States, of the title of said Francis Langlois ; but that in case I should fail to secxire and bring and produce such confirmation of title by the said Congress as aforesaid, then I am to have no claim whatever in and to said land as named in certificate No. 467, and the said deed from said Rector to me of this date is to be null and voidP The court finds from extrinsic evidence that these instruments were executed and exchanged at one and the same time, and were parts of one and the same transaction.
*356 Y. — In Gaines’ Case.
Tlie United States to Ludovicus Belding. — Pre-emption right under act 29th May, 1830, (4 Stat. L., 420.) Certificate of register and receiver of land-titles.
Under this it is claimed that Ludovicus Belding occupied and cultivated, pursuant to the terms of the statute. Certificates of entry by the register and receiver of the land-office, and a receipt for the payment of $200 by the heirs of Belding in 1851, are produced.
Ludovicus Beldiug to Maria Belding, (wife of William EL Gaines,) Albert Belding, Henry Belding, and George Beld-ing — By descent.
Ludovicus Belding died intestate, leaving his widow, Lydia Belding, and his children above named. The widow subsequently died also intestate, and the children succeeded to the interest of herself and her deceased husband.
We now come to an examination of the facts upon which the several titles rest.

1. Of the title of John Percifull.

It rests exclusively upon the Act April 12,1814, (12 Stat. Tj., 121, § 5,) his previous inhabitancy and cultivation, and an alleged foothold upon the property, maintained from that time to the present by himself, his tenants, his heirs, and their assignee. No entry has ever been allowed and no certificate has ever issued. The first attempt to enter or purchase under the act was in 1838, after the Reservation Act April 20, 1832, had passed, but before the land had been offered for sale, though after public surveys had been made.
As against the Government, the facts are these :
1. The widow of Percifull, in 1838, applied to enter and purchase the lands under the act of 1814, and filed her proofs to establish her right of pre-emption. On the 27th September, 1838, the receiver and register of the land-office in Arkansas rejected the application upon the ground that the land sought to be entered had been located by a uNeic Madrid certificate, No. 467, in the name of Francis LangloisP
*357 2. In 1843 sbe again made application to enter and purchase the lands under the same act, and filed further and additional proofs. She also made tender of $200 in gold coin, the amount of the purchase-money of the quarter-section. This application was also rejected on the following grounds: First, that the land claimed was not ceded to the United States by the Quapaw Indians until 1818, and was not subject to pre-emption under the act of 1814; second, that the land was reserved from entry or sale by the Reservation Act April 20,1832; third,11 that, admitting the validity of a settlement, the claimant, in her proof herein, has failed to mahe out her case under the Act April 12, 1814.»
3. In 1850 the heirs or representatives of Percifull made further proof of their right to enter the lands. On the 10th February, 1851, the receiver decided that Percifull “did actually inhabit and cultivate the tract of land above described, on and prior to the 12th day of April, 1814,” and uthat his legal heirs or representatives are entitled to enter the same under the provisions of said pre-emption laws of 12th April, 1814, at the minimum price of $1.25 per acre.” But the register on the same day decided “that John Percifull did nob actually inhabit and cultivate the southwest quarter of section 33, in township 2 south, of range 19 west, prior to the passage of the Act April 12, 1814.” These decisions were returned to the General Land-Office. On the 10th October following, the Secretary of the Interior decided that the right' of entry was barred by the Reservation Act April 20, 1832, and therefore that the claim was void.
4. By these proofs it appears that John Percifull in fact resided, in 1814, on the Wachita, seven miles distant from the Hot Springs, where he owned a house and cultivated a farm, Avhich was also a part of the public domain, but that he had erected a house and cultivated a garden at the springs, doing business there in summer during the.season of visitors, and returning to his home in the autumn. It also appears that the house or houses which he owned at the springs he leased, from time to time, to various parties till 1833, after which he resumed possession. His inhabitancy at the springs in 1814 does not appear to have been exclusive, but to have been shared by the visitors who came from year to year for the purpose of using the waters •, neither does he appear to have been *358 the first settler, nor to have inhabited and cultivated until the place had become a summer resort for invalids.
Upon these facts the claimant is understood to contend that the Act March 1, 1843, (5 Stat. L., p. 603, § 3,) removed all objections to his entry, and that, under the Sot Springs Act 1870, (16 Stat. L., 149,) this court is invested with equitable power to take the place of the land-office, and complete the proceedings which constitute a sale.

II. Of the title of Slias Sector.

This title rests entirely upon the New Madrid certificate in favor of Francis Langlois and the survey of James S. Conway, deputy surveyor, returned to surveyor-general’s office, at Saint Louis, in 1820.
As against the Government, the facts are these:
1. On the 26th of November, 1818, the recorder of land-titles at Saint Louis, upon what he deemed sufficient proof, issued a certificate, No. 467, in favor of “ Francis Langlois or Ms legal representatives,” entitling thorn “to locate 200 arpents of land on any of the public lands of the Territory of Missouri the sale of which is authorised by law.” This certificate was issued or delivered to Joseph Storey, the attorney and assignee of Lang-lois. The Government has filed no bill to set this certificate aside as erroneously issued or fraudulently obtained; therefore we are not at liberty to go behind it, and must hold that it was rightfully issued, and upon sufficient proof.
2. On the 17th January, 1819, Samuel Hammond and Elias Eector, to whom the certificate had been assigned by Storey, applied as representatives of Langlois, in writing, to the surveyor-general for the Territory of Missouri “for the entry and donation of 200 arpents of land to satisfy the said certificate, to be surveyed in a square tract, the lines of which to be corresponding toith the cardinal points, and to include the hot springs, so called, upon the waters of the Wachita River, south of the river Arkansas, the said springs to be as near the center of the square as circumstances will admit.” The surveyor-general accordingly ordered the survey to be made. This order is apparently not of record in the office, and is shown only by parol evidence. It was directed to James S. Conway, deputy surveyor.
3. On the 16th July, 1820, the deputy surveyor returned *359 bis survey, with a plat made out in triplicate, to tbe surveyor-general, by whom it was approved and filed. Tbe copy on file in tbe surveyor-general’s office is not found of record, and tbe fact that sucb a paper ever became a part of tbe records of tbe office is questioned. We bave considered tbe objections raised by the adverse parties and acknowledge tbeir weight, but it appears to us a conclusive fact that this survey of the deputy surveyor was numbered by him 2903, and that on tbe official “ List of certificates issued by the recorder of land-titles under the act of Congress of the 17th of February, 1815,” transmitted by tbe land-office at Saint Louis to tbe land-office at Little Eock, when tbe latter was established, there appears “survey 2903” opposite uNew Madrid certificate 467, for 200 argents of land issued to Francis Langlois; ” and this is further strengthened by documents from tbe Interior Department, where tbe same numbered survey also appears opposite tbe same New Madrid certificate. These official recognitions, taken in connection with tbe positive and circumstantial evidence offered by tbe claimant, places above all doubt tbe fact that tbe survey was filed. Consequently neither of tbe original triplicates not filed should be rejected as secondary evidence. Tbe approval of tbe surveyor-general is shown only by parol and circumstantial evidence, and is not a matter of record.
About tbe time this survey was returned to tbe surveyor-general’s office, instructions were received by him from tbe Secretary of tbe Treasury which prevented him from returning a plat of tbe location to tbe recorder of land-titles, as required by tbe second section of tbe New Madrid Act February 17,1815. It is conceded by tbe claimant that no steps were taken on tbe part of Hammond and Eector to compel tbe surveyor-general to return a plat of thé location to tbe recorder, and that no further steps to complete tbe title were taken by them or tbeir representatives until 1838, when tbe heirs of Eector applied for a certificate and patent.
Tbe objections of tbe officers of tbe land-office to tbe right of Eector to complete bis title have been, first, that these lands were not surveyed and offered for sale, and hence that tbe sale thereof in 1820 was not authorized by law; second, that tbe location of a New Madrid certificate must conform to tbe lines of tbe public surveys, and that it could only include quarter and half quarter sections to an extent not exceeding six hundred *360 and forty acres, and consequently that Hammond and Rector could not locate absolutely two hundred arpents of land; third, that the location being illegal and defective, and not completed before the Act April 26, 1822, (3 Stat. L., 668,) was not helped by the first section of that act, and is barred by the second; fourth, that the salé not having been complete and valid, the land is reserved by the Reservation Act April 20,1832.
Upon these facts the claimant is understood to contend that the return by the deputy surveyor of his survey and location, and the approval thereof by the surveyor-general, made the location complete; that the duty of returning a plat to the recorder of land-titles devolved exclusively upon the surveyor-general, and his neglect or refusal so to do could not defeat the party’s rights under the Act April 26,1822; and that the location thus made, being in contemplation of law complete, should be perfected into a grant in like manner as if it had conformed to the sectional lines of the public surveys.

III. Of the title of Ludovicus Belding.

This title rests upon the Act May 29, 1830, (4 Stat. L., 420,) and upon the actual possession of a house at the Hot Springs on that day, and the cultivation of a part of the quarter-section during the year 1829 by Ludovicus Belding. An entry is also relied upon which was allowed by the Secretary of the Interior in 1851.
As against the Government, the facts are these :
1. In 1839 the heirs of Belding applied for leave to enter the land, and offered proofs and showed a right of pre-einptiqn under the Act May 29, 1830, (4 Stat. L., 420.) No immediate decision was rendered on this application, but on the 23d October, 1850, the General Land-Office instructed the land-office in Arkansas to have a rehearing of the claim. Upon this rehearing the^receiver, on the 13th February, 1851, decided that Bel-ding u ivas in possession of the Sot Springs on the 29th-May, 1830, not in his own right, however x hut as tenant wider and hy virtue of a lease from John Percifull, who, it is shown, claimed said springs and had possession of them and that Belding cultivated 11 a portion of the land embraced in the quarter-section on which the Sot Springs are situated, hut that he only acquired the right to cultivate said land hy means of said lease from John Percifull to *361 him;” and that u all the improvements which said Belding put on said quarter-section during the time he held possession were made in accordance with an express agreement between him and Percifull that he should do so, and on the consideration of which Percifull leased the springs to him ; and that said improvements were made for the use and benefit of said Percifull, and not Belding and that “ the purchase of the Miller cabins toas made by Belding for ■the use and benefit of John Percifull, and not for his own use and benefit, nor longer than for the term of his said lease and that 11 the heirs and legal representatives of said Ludovicus Belding, deceased, are not entitled to enter said land by pre-emption under the provisions of the aet approved 29th May, 1830. On the 22d March, 1851, the register decided that “ it was clearly proven that the said Ludovicus Belding did cultivate said southwest quarter of section 33, in township 2 south, of range 19 icest, in the year 1829, and that he had possession of the same on the 29th May, 1830, as required by the first section of the pre-emption law approved 29th May, 1830.” The Commissioner of the General Land-Office, on the 20th of August, 1851, decided that Percifull had no power to lease the public lands, and that the inhabitancy inured to the benefit of Belding, but he reserved a final decision upon the application. On the 21st November, 1851, the Secretary of the Interior, Mr. Stuart, on appeal from the Commissioner of the General Land-Office, decided that it would be “proper and in accordance ivith precedent,” to permit the heirs of Belding to make an entry under the Acts May 29, 1830, and July 14, 1832, as reguested by them, which request stated that such entry should be, “in order that they may be placed in a proper position for the assertion of their rights hereafter in the courts,” and declared that they would not ask for a patent. The Secretary of the Interior further said in his decision, “Said entry will remain subjeet to the same power of revocation and control by the General Land-Office and this Department as may be lawfully exercised over any ordinary entry. The Government ivill still hold the power of protecting its own rights, while the claimants ivill simply be placed in a position to contest the adverse claims of others to the same land.” Under and in pursuance of this decision the register and receiver of the land-office in Arkansas entered the land in favor of the heirs of Belding, and issued the usual certificates, and they accepted and received from them the sum of $200 purchase-money, which is still retained by the Government.
*362 On the 7th June, 1860, the Secretary of the Interior, Mr. Thompson, decided that the entry allowed by his predecessor, Mr. Stuart, in favor of Belding’s heirs, was forbidden by the Reservation Aet April 20,1832, and he directed that the certificate be canceled and annulled. No further or formal cancellation was ever made, nor was the purchase-money ever refunded to the pre-emptors.
The objections of the officers of the Laud-Office to this title are believed to rest exclusively upon the Reservation Aet, with the exception of the first decision of the receiver, who held that his occupancy was in fact an occupancy for his lessor, Percifull.
Upon these facts the claimants are understood to contend that Belding acquired a right to pre-empt under the Aet May 29,1830, which was revived and restored to him by the Aet July 14,1832, notwithstanding the Reservation Aet April 20, 1832. It is also understood that they contend that the reasons assigned by the Secretary of the Interior, in 1851, for allowing their entry cannot be considered as legal conditions affecting its validity, and that the subsequent revocation by a succeeding Secretary, in 1860, was void.
Before proceeding to the consideration of the respective cases, it may be desirable to inquire as to the authority and limitations under and within which this court must act.
The alienation of the public lands has always been confided exclusively to the officials of the Land-Office. Upon well-understood principles, a power confided to a special tribunal cannot be reviewed by courts of law or equity. As between the Government and those seeking to become purchasers or grantees, the final action of the Land-Office has always been regarded as final by the judiciary. Its decisions, whether rightful or wrongful, have never been reviewed, either to enforce a sale by mandamus or to prevent it by injunction. But as these decisions have necessarily lacked many of the satisfying elements which are the essentials of a judicial judgment, the courts of the United States have devised and established two collateral principles in furtherance of the maintenance of legal rights. The first of these is that, when a pre-emption purchaser has paid his money and received from the officials of the local land-office his certificate of pre-emption, he thereby acquires an equitable estate, hereditable, devisible, assignable. The legal estate remains in the Government until the patent issues, *363 but the property becomes severed from tbe public domain. After such property becomes so severed, notwithstanding that the legal title remains in' the Government, it is no longer the property of the United States, nor subject to reservation by Congress. Though not conveyed, it is nevertheless sold. The second of these principles is that, although the action of the Land-Office is conclusive as between the Government and the purchaser, it does not affect the rights of third persons. Thus, though the purchaser has been decreed by the Land-Office to be entitled to the property, and has been invested with the legal as well as the equitable title by patent, yet nevertheless, in contemplation of the judiciary, he takes only as trustee for the rightful owner; that is to say, for a more rightful purchaser. Thus collaterally the action of the Land-Office may be reviewed as between two parties asserting conflicting rights, provided always that the property has been severed from the public domain.
In 1870 the Hot Springs of Arkansas had been the subject of legal contention for thirty years, and every conceivable method which professional ingenuity could devise had been resorted to to obtain, directly or indirectly, the adjudication of a court upon the rights of the parties. No one had received a patent or pretended to have acquired the legal title, but each had again and again insisted that he was the equitable owner of the property. At the same time the interposition of Congress had been invoked for a confirmation -of one or the other of the titles. With such precedent facts existing, Congress passed the uAct in relation to the Hot Springs reservation in Arhansas ” June 11, 1S70, (16 Stat. L., 149.) It provides that “ any person claiming title, either legal or equitable,” may institute in this court “ any suitthatmayhe necessary to settlethe same; ” that suchsuits u shall he conducted and determined according to the mies and principles of equity practice and jurisprudence in the other courts of the United States ; ” that this court shall be uinvested with the jurisdiction and powers exercised hy courts of equity so far as may he necessary to give full relief; ¶ that separate suits, asserting conflicting rights, u shall he consolidated and tried together,” the court being directed to “ determine the question of title, ” and to grant “ all proper relief as heticeen the respective claimants, as well as between each of them and the United States; ” that if the final decision be in favor of the defendants, the court £i shall *364 order such lands into-the possession of a receiver ;n and, if its decision be in favor of a claimant, it shall “proceed by proper process to put such successful claimant in possession,” and that upon the filing of its decree with the Secretary of the Interior, he shall cause a patent to be issued to the party in whose favor such decree shall be rendered.” We do not understand this statute to cede any interest of the United States, or to confer on others any right, legal or equitable. The equity to which it alludes is not a natural or moral equity, to be measured by the discretion of this court, but simply that equity which springs from the possession of a legal right. The case contemplated by the statute is that of a man in possession of lands under a contract of sale, but who has not received a deed from the vendor. He goes into a court of equity to obtain a decree for specific performance. If it be found that he is the equitable owner, the court compels the execution and delivery of the deed; if it be found that his contract of sale is invalid, the defendant obtains a decree, and, In this case, is to have the possession restored. There is nothing in the act which substitutes this court in the stead of the officers of the Land-Office to perform any duty which they may have left undone; neither is there in the act anything which, as against the Government, authorizes the court to review their proceedings and say they were wrong. After the court has reached the point of determining that the equitable title has passed to one or the other of the claimants, then, indeed, it becomes its duty to decree specific performance against the Government, or to go behind the action of the Land-Office, and ascertain which of the parties is the rightful purchaser. But until that point is reached, it is possessed of no more power, aside from jurisdiction, than any other court of the United States. In other words, the act is strictly remedial and jurisdictional, and its characteristic essentials are, first, that it confers jurisdiction as against the Government; and, second, that it enables all of the contending parties to have their conflicts settled by a single decree.
The first pre-emption title, that of John Percifull, is founded not so much upon what the officials of the Land-Office have done, as upon what they have left undone. It is claimed that on the onehand he has done everything which thelaw required should be done to vest in him the right of acquiring title, and on the other *365 band that the officers of the Government have evaded the duties imposed upon them by law, and have erroneously refused to confer upon him the evidence of his legal rights. Waiving the question of jurisdiction, let us inquire how far this assumption of title can be sustained.
It has been the settled land-policy of the Government, so far as titles acquired by purchase and sale are involved, that the public lands shall be first surveyed upon a strict mathematical system of ranges and sections which is founded upon astronomical observations, and almost entirely disregards the irregular formations of natural boundaries. It has also been its policy that the public lands shall not be sold until, after being thus surveyed, they have been publicly offered for sale. Besides this strictly legal policy which contemplated a survey and public .offering to sell and a sale, there has been a parallel policy founded upon license and usage rather than upon express provisions of ■law. This policy has permitted the settler to go upon the public lands at any time, to occupy and cultivate, but to do so at his own risk. On the one hand he acquired no rights whatever; on the other he was not prosecuted for trespass. As these settlers have pushed out beyond the region of surveyed lands and beyond the confines of civilization, founding homes where they were legally trespassers, the legislative power from time to time has come to their aid by passing what are generally known as pre-emption acts. These pre-emption acts, however, conferred no vested rights, for the power of refusal to sell still rested in the Government, and pre-emption meant nothing more than the right to buy should the Government elect to sell, the privilege of pre-emption going merely to the exclusion of all the world as competing purchasers. If the Government should never elect to sell, the settler would be no better than though the pre-emption act had never passed. But in course of time the lands would be surveyed and offered for sale, and then, if no Government reservation intervened, the occupant would become the first and exclusive purchaser. It was inevitable that this should be the policy of the Government if it was to retain any control over its own lands; for it was not omnipresent, and, until the public surveys were made, could possess no specific knowledge of the lands which it should retain. If mere settlement before survey could work a sale, it was inevitable that the public lands would be alienated *366 at the will of any individual who chose in this manner to become a purchaser. The pioneer, by going on the unsur-veyed lands, obtained the benefit of an option as against other men, but he also ran the risk of never acquiring title for himself. The Government forbore to hold him in damages for his trespass, and he placed himself without remedy against the Government for his imprudence. The public survey, therefore, was necessary to inform the Government whether it would sell or not, and until this public survey was made and the discretion of the Government to sell exercised, the officials of the Land-Office were without authority to confer rights upon purchasers, and acted in the strict line of their duty when they refused to allow entries upon such lands.
It has also become a settled principle with our courts that lands which have been offered for sale may be reserved from sale by Congress at any time before sale is made. When the officers of the Land-Office have issued their certificates and received the purchaser’s money, the land is severed from the public domain. Thereafter, if the sale be legal, neither Congress nor the Executive has power to undo what their agents have done. But until then the right of reservation is complete. It may work individual injustice, but it is a power which cannot be questioned. The case is that of a man whose agents, duly authorized to sell his lands, offer them for sale, and hold out inducements and give assurances. But so long as they enter into no binding contract, the would-be purchaser acquires no rights in the land, and the owner may withdraw it from the market at his pleasure. Under the Pre-emption Aet 1814, the agents of the Government were never authorized to sell this property. Before such authority was given, the owner decided that it should not be sold. Pereifull, therefore, never bought. He at best only placed himself in a position where he might buy if the Government ever decided to sell. His expectations never reached the result of a valid contract, and his representatives possess no title, legal or equitable.
In this case much has been said about the natural equity which Pereifull acquired, and about the intent of Congress, through the Hot Springs Aet 1870, to give legal effect to this equity. So far as the statute is concerned, it is not perceived, as between these contending parties, the claimants, and the Government in the character of defendant, that it confers a *367 single interest or waives a single right. At the very threshold of the statute it is announced “ that any person claiming title, either legal or equitable, to the whole or any part of the four sections of land constituting what is Icnoicn as the Sot Springs reservation, &c., may institute against the United States in the Court of Claims, and prosecute to final decision, any suit that may be necessary to settle the same? This provision is conditional upon our jurisdiction. The party must claim a title,” which may be “ either legal or equitable,” and the suit must be one “ necessary to settle the same? If it be not a “ title,” “ legal or equitable,” the court is without jurisdiction to entertain his suit. The statute is strictly remedial. It gives a remedy for the assertion of a right, but it makes no grant on the part of the Government, and waives no right which the United States as defendants possess.
But aside from this construction of the statute, which as a matter of law may or may not be right, we are unable to perceive as a matter of fact that this claimant possesses any natural or moral equity which in any event would entitle him to the assistance of a court of equity. The Pre-emption Act, which is the foundation of the suppcjsed right, was in favor of one who at the time of its passage had “ actually inhabited and cultivated a tract of land? At the time when he is asserted to have acquired his right of. pre-emption, John Percifull actually inhabited and cultivated another tract of land. He came to the Hot Springs to carry on a business there, precisely as hucksters go to our fashionable summer-resorts to carry on their business during the season. When he first inhabited the springs, they were already inhabited by invalids, who came there for the restoration of health. His occupancy was as transitory as theirs, save that a constantly recurring business brought him back from season to season. The policy of the Government was in aid of those who went out into the wilderness to subdue it, and to make ordinary homes and to pursue ordinary avocations. It was a general policy, designed for general purposes, for those who actually inhabited and cultivated, and not where the cultivation and the inhabitancy were both nominal, or at best technical. The laws upon this subject have always contemplated a general policy, and have never been designed to favor those whom chance or sagacity led to some exceptional spot. There could be no general policy designed to cover ex *368 ceptional oases. The Hot Springs were as exceptional as the salt springs and lead mines excepted by the act 1807 j and if through the ignorance and heedlessness of legislation the terms of such general reservations wore not accurate enough to cover the Hot Springs, it is a technical defect in the statute, which does not create an equity in the claimant.
The second pre-emption title, that of Ludovicus Belding, is also without those merits which would commend it to a court of equity. Its supposed merits have been pressed upon the court with unusual ability and zeal, and we do not doubt that long contemplation of the pre-emption laws, and the sight of-other men acquiring'by their machinery a title to other property, and the protracted contest and enormous outlay which have gone on in the way of litigation, have brought both counsel and parties to the sincere conclusion that their case is a hard one, which must awaken sympathy if not procure redress. But while the claim of Percifull has some of the attributes of a first settler, the title of Belding has nothing whatever to awaken sympathy. He entered upon the property after it had become a well-known resort in Arkansas, as well known as Saratoga was in New York, or the Sulphur Springs in Virginia. A small village shared the occupancy with him, and his business was selling groceries -to those who were as much first settlers as himself. His occupancy was not in his own right, for he held in the simple character of tenant, acknowledging the rights of his landlord, who was John Percifull, and, from the time he entered until the time he vacated, claiming nothing more. He declared by a written instrument his obligation “ to deliver all and every part of the buildings and improvements at said Hot Springs that I have or ever had unto John Percifull, if he demands the sameand u I have no pretension to the improvement of said springs except under the claim of the said John Percifull.” His occupancy and cultivations the year 1829, and his possession on the 29th May, 1830, were an accident of time, for he vacated the premises soon after the act took effect. In his life-time he certainly never supposed that he could assert a right to this property. After his death it almost seems as though some one had taken the statute in one hand and had run down the list of occupants with the other until he found a resident who could nominally comply with the conditions of the act. What is *369 asserted, therefore, on behalf of his heirs is not an equity, but the stringent application of a legal technicality, which is this :
The Act May 29, 1830, under which the Belding heirs claim, provided “ that every settler or occupant upon the public land sprior to the passage of this act, who is now in possession and cultivated any part thereof in they ear 1829, shall be, and he is hereby, authorized to enter,” <&c., “ any number of acres, not more than 160 u provided, however, that no entry or sale of land shall be made under the provisions of this act which shall have been reserved for the use of the United States,” &o. At that time the Hot Springs had not been reserved; and if Belding were an occupant and cultivator and possessor within the intent of the act, and if the lands had been surveyed, he would have been entitled, apart from the prior rights of others, to pre-empt this quarter-section. But that statute further provided “ that this act shall be dnd're-main in force for one year from and after its passageDuring that year Belding made no entry, and under that act his right expired. But another act reviving the right was passed. Congress, however, in the mean while, had passed the Reservation Act April 20,1832, which in express terms provided that the Hot Springs “ shall be reserved for the future disposal of the United States,■ and shall not be entered, located, or appropriated for any other purpose whatever.” The same Congress, then, on the 14th July following, passed the supplemental act providing that persons “ entitled to a pre-emption according to the provisions of the act of 29th May, 1830,” “ and ivho have not been or should not be enabled to malee proof and enter the same within the time limited in said act in consequence of the public surveys not having been made and returnedf &c., “ shall be permitted■ to enter the said lands, on the same conditions in every respect as are prescribed in said act, ivithin one year after the surveys are made,” &c. The Belding heirs complied with the conditions of this act. They entered or attempted the entry of the land within one year after the surveys were made, and they claimed, as they still claim, that this act took the Hot Springs out of the Reservation Act, and was a “ disposal ” of them within its meaning.
We cannot accept this construction of the statutes. If the three acts be in pari materia, and are to be read together, then, at the time that Belding’s heirs sought to effect an entry, they would have read as follows: That every settler on the public lands in 1829 shall now, in 1838, have the right to enter, *370 &c., provided that no entry shall be made upon land which is reserved from sale by act of Congress, (Act May 20, 1830, § 4,}' and provided further that the Hot Springs shall be so reserved. The rules for the construction of statutes have been applied to this case, with great ingenuity, to show that the third statute was a 11 disposal ” within the meaning of the second; but the controlling rule which must govern, aud which is often exclusively applicable to statutes as carelessly drawn as those of the United States, is, that they shall be construed according to the true intent and will of the legislative power. As has been said, the same Congress passed the last two acts. The first of these reserved the Hot Springs “for the future disposal of the United States,” and forbade that they should be u entered, located, or appropriated for any other purpose tchat-everP The second, three months later, allowed certain persons to mate proof who had not been able to make it within the time limited by the act of 1830. But when this Congress looked into the primary act of 1830 they saw it expressly written that entries and sales were not to be allowed upon land reserved for the use of the United States, and that the right of upreemption contemplated by this act ” should not extend u to any land which is reserved from sale by act of OongressP The supjfie-mental act did not repeal the Reservation Act, in terms. Can it be believed that the same Congress that passed both intended, through mere rules of construction, to undo by implication what they had expressly done by statute, or to allow a settler who had acquired no legal rights whatever to perfect his title, by means of the payment of $200, to that which had been deemed of so much importance as to be worthy of express statutory reservation? Unquestionably the same Congress never intended to reserve and to give away; to undo indirectly what it had just done directly. The act of revival must be applied to the original act as if the intervening statute had worked a vested right in favor of a third person, which is the Government in its corporate or proprietary as distinguished from its legislative character.
As already has been shown, these claimants also place their title upon the entry allowed at their special request, and for a particular purpose, by Mr. Secretary Stuart. It is certain that while that entry may have given a technical legal right, it imparted no equity to the case of these claimants. Obtaining *371 it through the express declaration that it should not be used ag'ainst the Government, and then seeking thus to use it on the technical ground that the representations of the parties and the purpose of the Secretary cannot' control his action, is not a foundation on which to place an appeal to the favorable consideration of a court of equity. It may be questionable whether the Government would not have had a right to file a cross-bill for the purpose of setting aside the entry as fraudulently obtained, but we may lay that question aside under the construction we have given to th e statute. The en try was illegal because the Secretary was forbidden to allow it. The reservation act bound him and the parties equally, and they could take nothing by his violation of the statute. Our conclusion is that these claimants have no title, either legal or equitable.
The last title, that of Elias Eector, rests upon the construction of a single statute, which is the New Madrid Act, (3 Stat. L., p. 211, § 1.) A pre-emption title is founded upon purchase and sale, but a Hew Madrid title is founded upon an exchange of lands. The purpose of the law was to allow persons in a certain district to give their injured lands as the sole consideration for others which they were authorized to select. When the selection, termed a location, was complete, “ according to the provisions of this act,” the title of the party in the injured land was to “ revert to and become absolutely vested in the United States.” Conversely, when the location was complete, according to the provisions of the act, the land selected was severed from the public domain and became the property of the locator. If in the case of Eector a location was made in 1820, then its alleged defects were cured by the first section of the Act April 26,-1822, (3 Stát. L., 668,) and it should “ be perfected into a grantP If no location was made, then the New Madrid warrant is barred by the second section of the same statute. The Act March 2, 1827, (4 Stat. L., 219,) is to the same effect, except that it does not contain a statute of limitations, but it helps only “ locations of lands heretofore made according to law,” and leaves the limitation of the preceding act as to New Madrid warrants unrepealed. What, then, was a location under the New Madrid Act?
The act requires that after the New Madrid warrant or certificate of destroyed lands has been issued, 11 and after a loca *372 tion thereof has been made, on the application of the claimant, by ■the principal deputy surveyor for said Territory, or under his direction,it shall be the duty of this principal surveyor “ to cause a survey thereof to be made, and to return a plat of eaeh location made to the said recorder, to go with a notice in ivriting designating ■the tract or tracts thus loeated and the name of the claimant on whose behalf the same shall be made, which notice and plat the said recorder shall cause to be recorded in his office, and shall receive from the claimants for his services on each claim the sum of $2 for receiving proof , issuing the certificate, and recording the plat and notice as aforesaid.” (§ 2.) The recorder was then to deliver to the party a certificate, stating that he was entitled to a patent for the tract designated j but this certificate was to be filed with the recorder within twelve months after its date, and the recorder was then to issue another certificate in favor of the party, which, on being transmitted to the Commissioner of the General Land-Office, should entitle the party to a patent. In this case it will be recollected that Hammond and Rector, the holders of the New Madrid certificate, applied for a location thereof to the surveyor-general for the Territory, and that he caused a survey to be made, which was returned to and approved by him, and filed in the surveyor-general’s office; but by reason of instructions then received from the Secretary of the Treasury, who was then the head of the Land-Office, the surveyor-general took no further steps in the matter, or, in other words, never returned a plat of the location to the recorder with the notice in writing designating the tract located and the name of the claimant on whose behalf it was made.
But between the New Madrid Act of 1815 and the alleged location by Rector in 1820, the Act April 29, 1810, (3 Stat. Li, 325,) intervened. It established a new office of surveyor of the public lands in Illinois and Missouri, afterward termed the surveyor-general; it transferred to him all the duties of the •“principal deputy surveyorit directed that he should transmit plats of all lands surveyed to the register and to the General Land-Office; it provided that all plats of surveys belonging to any office theretofore established for the purpose of executing or recording surveys should be delivered to this surveyor; and it gave him power to certify plats of survey to be used as evidence in courts. This act, it is claimed, in effect, transferred some of the powers of the recorder to the suiveyor-general, *373 and by necessary implication changed the relative duties of the two offices.
It has been argued with unusual learning and power that the location was complete when the survey was made, returned, approved, and filed in the office where it was permanently to remain, and that thereby the title to the land injured by the earthquake reverted to and vested absolutely in the United States. We are not unmindful of any part of this cogent argument. Weperceive that everything had been done by the parties which the law required them to do, and that everything which remained to be done was made a statutory duty on the part of the officers of the Government. We also perceive that by the surrender of the first certificate a party might suffer irreparable loss, and that he was without legal means tó compel the surveyor-general to act by transmitting the plat and notice to the recorder. We are also aware that the Supreme Court has enunciated the principle that things which the public officers ought to have done should be regarded as having' been done. (Lytle v. Arkansas, 9 How., 314.) But the Supreme Court has also declared that, before the New Madrid or injured lands “ shall revert to and become absohitely vested in the United States,v the plat of the location and the notice in writing designating the tract located must be returned to the recorder of land-titles. The precise point presented by this case has, we believe, never been presented to the Supreme Court, but the declaration or construction to which we have alluded runs through six of the decisions of the court, beginning with 13 Peters and continuing to 19 Wallace. (Bagnell v. Broderick, 13 Pet., 436; Barry v. Gamble, 3 How., 32 ; Lessieur v. Price, 12 id., 57; Hale v. Gaines, 22 id., 144; Rector v. Ashley, 6 Wall., 143; McKay v. Easton, 19 Wall., 619.) With that reiterated opinion of the Supreme Court before us, we do not feel at liberty to regard it as the mere dictum which might drop from a single case. While we do not feel satisfied with the construction which has been directly or indirectly given to the statute, and while we think the facts of this case will present a substantially new question to the Supreme Court, upon which it will not be bound by its former rulings in other and essentially different cases, yet still we do not feel at liberty to disregard what the court of last resort has so repeatedly said, and deem it best to leave to that tribunal the duty of correcting its errors, if errors they be. We *374 must therefore decide that no location was ever made by Hammond and Hector, and that their representatives have no title, legal or equitable.
A decree will be prepared by the counsel for the Government-conformable to this opinion, which will be settled at chambers, on five days’ notice to the adverse parties. (Post, p. —.)