MATTHEW J. KANE, CHIEF JUSTICE.
JOHN B. TURNER, VICE CHIEF JUSTICE
R. H. LOOFBOURROW,
STILLWELL H. RUSSELL, } JUSTICES.
FINIS E. RIDDLE,

---

### JOHNSON et al. v. RIDDLE.

No. 1190. Opinion Filed February 10, 1914.

Rehearing Denied April 17, 1914.

(139 Pac. 1143.)

1. **PUBLIC LANDS—Town-Site Commission—Jurisdiction—Indians.**
A town-site commission for the Chickasaw Nation, appointed and
acting under the provisions of the act of Congress of June 28,
1898 (30 St. at L. 495, c. 504), had power and jurisdiction to decide
contests between conflicting claimants of a preference right to
purchase a town lot; and, upon the abolition of the commission, its'
powers and jurisdiction were transferred to the United States
Indian Inspector for Indian Territory.

2. **SAME—Erroneous Patent—Remedy of Rightful Claimant.** It is
well settled that, if the officers of the Land Department are induced
to issue a patent to the wrong party by an erroneous view of the
law, or because of a gross or fraudulent mistake of the facts, the
rightful claimant has a remedy, and may avoid the decision of the

Land Department and charge the legal title of the patentee with his equitable right to it, either upon the ground that, upon the facts found, conceded, or established, without dispute, at the final hearing before the department, its officers fell into a clear error in the construction of the law applicable to the case, which caused them to issue the patent to the wrong party, or that, through fraud or gross mistake, they fell into a misapprehension of the facts proved before them, which had the like effect.

3. EVIDENCE—Presumption—Acts of Officers. In a suit to enforce such a remedy, however, all reasonable presumptions must be indulged in support of the officers intrusted by the law with the proceedings resulting in the patent.

4. PUBLIC LANDS—Town-Site Commission—Contest. A town-site commission for the Chickasaw Nation, acting under authority of the "Atoka Agreement," which is embraced in an act of Congress approved June 28, 1898 (30 St. at L. 495, c. 504), and which provides, "When said towns are so laid out, each lot on which permanent, substantial and valuable improvements, other than fences, tillage and temporary houses, have been made, shall be valued by the commission, * * * the owners of the improvements on each lot shall have the right to buy one residence and one business lot at fifty per centum of the appraised value, * * * " etc., is under the duty, when two persons appear and contest for the preference right to purchase a lot, to decide two things: First, are the improvements on the lot sufficient under the law to entitle it to be listed as an improved lot? Second, if so, which of the contesting claimants owns the improvements situated on the lot? And, having determined these questions, it is under the duty of awarding to the owner of such improvements the preference right to purchase the lot; and this regardless of any question of former possession, or previous holding of the lot raised by the parties that does not involve the ownership of the improvements.

5. FORCIBLE ENTRY AND DETAINER—Nature of Action—Possession. An unlawful détainer suit brought in Indian Territory, under the provisions of the laws of Arkansas (Mans. Dig. c. 67, sec. 3365) in force there, was purely a proceeding at law, involving in no way the equitable jurisdiction of the court, or the title to the property. Such suit related solely to the question of possession.

(Syllabus by Brewer, C.)

*Error from District Court, Carter County;*
*S. H. Russell, Judge.*

Ejectment by F. E. Riddle against E. B. Johnson and others. Judgment for plaintiff, and defendants bring error. Affirmed.

*Bond & Melton* and *C. C. Potter,* for plaintiffs in error.

*W. A. Ledbetter, A. C. Cruce,* and *C. B. Stuart,* for defendant in error.

---

*Appealed to the Supreme Court of the United States.

Opinion by BREWER, C. This is a suit in ejectment brought to recover lot 3, block 46, in the city of Chickasha, by F. E. Riddle, the holder of the legal title thereto under a deed issued to him under the town-site laws applicable to the Choctaw and Chickasaw Nations, against E. B. and H. B. Johnson and the First National Bank Building Company and others. The defendants admit the legal title to be in Riddle but, by cross-petition, seek to have the court declare him a constructive trustee, holding the legal title for their use and benefit, and to decree a conveyance of title from him to them. The district court of Carter county refused to declare a trust, and awarded judgment to Riddle for the lot. From this judgment the defendants bring error.

In 1892 one Fitzpatrick, a citizen of the United States, without membership in any Indian Tribe or Nation, or any rights which might flow from such tribal membership, made a contract with one Barnhart, relative to the lot in controversy, the same being at the time a vacant unimproved lot, by which contract Barnhart went into possession of the lot and erected thereon a substantial but inexpensive house and other improvements, which were to belong to him; but he was to pay a small ground rent to Fitzpatrick. It is not attempted to be shown in the record what right Fitzpatrick claimed, or that in fact he had any right, to seize upon vacant tribal lands and contract concerning them, as he did. In 1897 Barnhart sold the improvements on the lot, and transferred the possession to one Ellis, who went into possession and further improved it. Barnhart had paid ground rent, and Ellis, after he went into possession, made some payments of money to Fitzpatrick which may be treated as ground rent, but which, in the contest later before the department, Ellis claimed had been paid, not as rent, but for other purposes. It is certain that about April 1, 1898, Ellis refused to pay rent, and on July 7, 1898, Fitzpatrick brought an unlawful detainer suit against Ellis in the United States Court for the Southern District of Indian Territory, alleging, in addition to the usual averments in such a petition, that he desired possession for the purpose of being able to place thereon such improvements as would

give him, under the town-site laws, then enacted, the preference right to purchase the lot. After bringing the suit, April 8, 1899, Fitzpatrick conveyed any right he had to Ella Cross, who in turn conveyed a one-half interest to one Bourland on September 10, 1900.

Fitzpatrick prevailed in the unlawful detainer suit in the United States Court, also, on appeal, in the Indian Territory Court of Appeals (*Ellis v. Fitzpatrick*, 3 Ind. T. 656, 64 S. W. 567), also in the Eighth Circuit Court of Appeals by a decision given October 27, 1902 (118 Fed. 430, 55 C. C. A. 260). In the meantime Ellis retained possession of the lot through a supersedeas bond.

On February 8, 1902, the town-site commission for the Chickasaw Nation, organized pursuant to the provisions of what has been usually called the "Atoka Agreement" (Act June 28, 1898, c. 504, 30 St. at L. 495), proceeded to Chickasha for the purpose of scheduling town lots to those possessing the preference right to purchase same, under the law. This being prior to the final decision in the unlawful detainer suit, a clerk in the town-site office marked the lot in litigation on the tentative schedule. On March 26, 1902, Ellis conveyed his rights to Riddle and Mat Cook, and on the same day Riddle appeared before the agent in charge of the town-site schedule and produced his bill of sale to the improvements, and represented that, while the possession of the lot was in litigation in the unlawful detainer suit, the improvements on the lot, and the ownership thereof, were not in litigation; thereupon the lot was scheduled to Riddle and Cook, who were later, on June 12, 1902, notified that they had the preference right, under the law, to purchase the lot. They availed themselves of this right on June 19, 1902, by paying to the United States Indian Agent the full sum required under the law and the appraisement placed on the lot. On September 26, 1902, Bourland and Cross, as claimants under Fitzpatrick, protested by letter to the town-site commission, and seem to have continued the correspondence until July 31, 1903, when H. B. Johnson, who in the meantime had purchased the Fitzpatrick

claim, also deposited the purchase price of the lot with the United States Indian Agent.

On January 1, 1902, before the Johnsons had purchased or claimed any interest in the lot, H. B. Johnson, who it appears owned or was interested in an adjoining lot, entered into the following agreement with Ellis:

"Indian Territory, Southern District. This agreement made and entered into on this day by and between J. P. Ellis, party of the first part, and H. B. Johnson, party of the second part, witnesseth: That the party of the second part being desirous of using the rear end of lot number three in block forty-six, owned by the party of the first part, and he hereby agrees to erect good, substantial waterclosets, and to fence the same in with a good board fence, and to be paid for the use and rent of said premises. It is especially agreed that said improvements so erected shall be owned by and be the property of the first party to be used by him and his tenants for water-closet purposes and as a back yard, for a term of twelve months, and until the same are paid for in full subject to the provisions hereafter mentioned in case party of the first part should not be compelled to use the same after the expiration of first twelve months and in that case he shall pay party of the second part the cost of said improvements less the use of the same for said twelve months which is agreed upon to be at the rate of one dollar per month. It is agreed that the tenants of party of first part shall have the privilege of using one of said closets, so long as they do so without molesting party of the second part and his tenants by using same in such a way as to interfere with said second party and tenants. In case any disagreements should arise, and not settled satisfactory by said parties otherwise, then said party shall have the right of paying the said second party the full cost of said improvements and take full possession of same. Witness our hands this January 1, 1902. J. P. Ellis. H. B. Johnson."

In January, 1903, Bourland and Cross obtained possession of the lot, and on February 3, 1903, Riddle and Cook instituted this suit in ejectment. On May 25, 1903, the Johnsons bought the claims of Bourland and Cross, and were later made defendants, together with the First National Bank Building Company. These new defendants filed answer and cross-petition reciting all the previous litigation and the various transactions herein mentioned. Their vendors, Bourland and Cross, were engaged

in a contest proceeding, when the Johnsons bought them out, before the town-site commission relative to the award and scheduling of the lot, which was, on October 1, 1906, decided against them and in favor of Riddle and Cook, by J. George Wright, United States Indian Inspector. Voluminous evidence was introduced, and all the facts relative to the history of the lot, its possession, improvements, and the litigation in which it had been involved, were fully and minutely gone into and considered by the inspector. The inspector found that Riddle and Cook were the owners of the improvements on the lot, and that they were permanent and substantial, as required by the town-site law, and were such as would entitle such owners to have scheduled in their name, with the preference right to purchase, the lot on which they stood; and that, by virtue of their ownership of the improvements, Riddle and Cook were entitled under the law to the preference right to purchase the lot, and to obtain title upon payment of the purchase price. The decision noted all the facts herein mentioned, and all the findings were in favor of Riddle and Cook, with a particular finding that, under the evidence, the charge of fraud made in regard to the scheduling of the lot "was not entitled to serious consideration."

An appeal was taken from the decision of the inspector to the Commissioner of Indian Affairs, and there affirmed in an opinion. From thence it was taken before the Secretary of the Interior and again affirmed in an opinion. It was then reviewed by an Assistant Attorney General, who concurred in the decision of the department. Patent was finally issued to Riddle and Cook, May, 1907. Riddle in the meantime bought Cook's interest, and declared same in additional pleadings. While the unlawful detainer suit was pending, Bourland and Cross tried, by an injunction suit, to get possession of the lot for the purpose of improving it so as to qualify for preference right to purchase. They were refused the relief, and the judgment became final. After the unlawful detainer suit was decided in plaintiffs' favor, Bourland and Cross brought suit upon the bond under which Riddle's predecessor had retained possession, but it was determined in that suit that plaintiffs were not the owners of the

improvements on the lot, and that Riddle's predecessor in interest was such owner. This judgment became final.

"The provisions of the Atoka Agreement, by which the right to purchase lots in the Choctaw and Chickasaw Nations was conferred, so far as it is necessary to set them out in this case, as contained in the Curtis Bill (Act Congress June 28, 1898, 30 U. S. St. at L. 495), follow: 'It is further agreed that there shall be appointed a commission for each of the two nations. Each commission shall consist of one member, to be appointed by the executive of the tribe for which said commission is to act, who shall not be interested in town property other than his home, and one to be appointed by the President of the United States. Each of said commissions shall lay out town sites, to be restricted as far as possible to their present limits, where towns are now located in the nation for which said commission is appointed. Said commission shall have prepared correct and proper plats of each town, and file one in the clerk's office of the United States District Court for the district in which the town is located, and one with the principal chief or governor of the nation in which the town is located, and one with the Secretary of the Interior, to be approved by him before the same shall take effect. When said towns are so laid out, each lot on which permanent, substantial, and valuable improvements, other than fences, tillage, and temporary houses, have been made, shall be valued by the commission provided for the nation in which the town is located at the price a fee-simple title to the same would bring in the market at the time the valuation is made, but not to include in such value the improvements thereon. The owner of the improvements on each lot shall have the right to buy one residence and one business lot at 50 per centum of the appraised value of such improved property, and the remainder of such improved property at 62½ per centum of said market value within 60 days from date of notice served on him that such lot is for sale, and if he purchases the same he shall, within ten days from his purchase, pay into the treasury of the United States one-fourth of the purchase price, and the balance in three equal annual installments, and when the entire sum is paid shall be entitled to a patent for the same. In case the two members of the commission fail to agree as to the market value of any lot, or the limit or extent of said town, either of said commissioners may report any such disagreement to the judge of the district in which such town is located, who shall appoint a third member to sit with said commission, who is not interested in town lots, who shall act with them to determine said value.' "

After the passage of the act of Congress of March 3, 1905 (33 St. at L. 1048-1059, c. 1479), the town-site commissions were abolished, and the rules and regulations were altered and superseded to the extent that the Indian Inspector for the Indian Territory was charged with the duty of completing their work under the supervision, and subject to the approval, of the Secretary of the Interior.

The only question in this case is: Did the department err, as a matter of law, in awarding Riddle and Cook the preference right of purchase of the lot in controversy? There is no doubt but that the courts have a limited right to review, and power to overturn, the final decisions of the Land Department.

The rule seems well established that, as said in *Alluwee Oil Co. v. Shufflin,* 32 Okla. 808, 124 Pac. 15:

"If the officers of the Land Department are induced to issue a patent to the wrong party by an erroneous view of the law, or because of a gross or fraudulent mistake of the facts, the rightful claimant has a remedy, and may avoid the decision of the Land Department and charge the legal title of the patentee with his equitable right to it, either upon the ground 'that, upon the facts found, conceded, or established, without dispute, at the final hearing before the department, its officers fell into a clear error in the construction of the law applicable to the case, which caused them to issue the patent to the wrong party, or that, through fraud or gross mistake, they fell into a misapprehension of the facts proved before them, which had the like effect.' *Garrett et al. v. Walcott,* 25 Okla. 574, 106 Pac. 848; *Baldwin v. Keith,* 13 Okla. 624, 75 Pac. 1124; *James v. Germania Iron Co.,* 107 Fed. 597, 46 C. C. A. 476; *Wallace v. Adams,* 143 Fed. 716, 74 C. C. A. 540; *Gonzales v. French,* 163 U. S. 338, 17 Sup. Ct. 102, 41 L. Ed. 548."

It is no longer open to controversy that the town-site commissions in Indian Territory, acting under congressional authority, had power and jurisdiction to pass upon contests between conflicting claimants of the preference right to purchase town lots, and that, upon the abolition of the commissions, their power was transferred to the Indian Inspector. *Ross v. Stewart,* 227 U. S. 530, 33 Sup. Ct. 345, 57 L. Ed. 626; *Fast v. Walcott,* 38 Okla. 715, 134 Pac. 848.

In the case of *Ross v. Stewart, supra,* it is said by the Supreme Court of the United States:

"Relief will not be given in the courts from the decision of a town-site commission for a town in the Cherokee Nation in a contest arising on conflicting applications to purchase, or from the resulting patent, unless it clearly appears that the commissioners committed some material error of law, or that misrepresentation and fraud were practiced upon them, or that they themselves were chargeable with fraudulent practices, and that as a result the patent was issued to the wrong party."

And further it is said in the opinion that, in determining the matter, the test is:

"All reasonable presumptions must be indulged in support of the action of the officers to whom the law intrusted the proceedings resulting in the patent, and, unless it clearly appears that they committed some material error of law,  *  *  *  their action must stand."

The unlawful detainer suit between the remote predecessors of the present parties was purely a proceeding at law, involving the sole question of possession, and in no way involving the equitable jurisdiction of the court or the title to the property. *Brennan v. Shanks,* 24 Okla. 575, 103 Pac. 705.

In this case it is conceded that the findings of facts of the department are conclusive, and there are no circumstances of fraud or gross mistake to justify us in going into them, if it were not so conceded. So our inquiry is narrowed to a search of the department's decision to determine if, in awarding and patenting the lot to Riddle and Cook, it fell into an error of law. In approaching this question, we must constantly bear in mind the important facts that Riddle and Cook were, at the time the commission made the schedule, and their predecessors had been at all times prior thereto, the owners in possession of all the improvements on the lot; and that the Johnsons and their predecessors had never owned any improvements on it; and, further, that the improvements on the lot had not been forfeited to, or become the property of, the Johnsons or their grantors by operation of law for failure to remove them from the lot; that these facts are established by the final decisions of the suits betweer

the parties hereinbefore referred to, as well as by the findings and decision of the department.

As to the forfeiture of the improvements by not removing them in a reasonable time, which might generally result, it may be added that the department, after considering the contract under which they were made, and all the circumstances and acts of the parties, found and held that, even if this result would ordinarily follow under the contract, the forfeiture had been waived by Fitzpatrick and his successors and could not be used as a basis for the claim of ownership by them of the improvements. This was the decision of a mixed question of law and fact, involving intent to be gathered from the acts of the parties and all the circumstances, and is not subject to review by the court. We then come to the consideration of the provision of the law which must be applied.  It follows:

"When said towns are so laid out, each lot on which permanent, substantial and valuable improvements, other than fences, tillage, and temporary houses, have been made shall be valued by the commission, * * * the owners of the improvements on each lot shall have the right to buy one residence and one business lot at fifty per centum of the appraised value.  * * *"

It is believed that when a person applied to the town-site commission to have a particular lot scheduled to him under this law, and another person appeared and contested his rights in the premises, the town-site commission had power to determine but two things:  First. Are the improvements on the lot sufficient under the terms of the law to entitle it to be scheduled as an improved lot?  Second. Who, of the claimants, owns the improvements situated on the lot?  That the improvements on this lot met the requirements of the law is beyond doubt.  Then when the town-site commission, upon its investigation, found, as we again assert, that Riddle owned the improvements, and that the Johnsons owned no improvements, how can it be successfully affirmed that, in awarding the lot to Riddle, it fell into an error of law?  If the Indian Tribe, as owner of these town lots, having no relation with any of the claimants, and no relation to, or responsibility for, the possessory rights the courts had recognized as between the parties, had the right to prescribe the terms, ar-

bitrary though they were, as to whom it would give the prefer-
ence right to purchase, and has done this in the agreement with
the government, then, if it had the right to do so, it would seem
that when the government, in carrying out the agreement, through
the town-site commission, scheduled the lot to the actual owner
of the improvements, it followed the terms of the law, instead
of falling into an error of law.

Much has been said in the briefs about the improvements
being wrongfully on the lot; but this loses its force when we
examine and find that they were placed there in conformity to
a contract which provided for an ownership of the improvements
separate and distinct from the claim of possession, and which
made no provision for their removal from the lot, or their ac-
quisition by Fitzpatrick. In other words, these parties dealt
with a lot at a time neither owned or could own it, and by the
terms of their own contract one of them found himself, later on, ·
qualified as a purchaser of the lot, when an agreement made be-
tween the federal government and its owner came to be put in
operation. But it is strongly and persuasively urged, and we
were induced in the former opinion in this case to believe, that
we should go beyond the letter and plain meaning of the law, and
consider the prior possession and previous holding of the lot.
But after much consideration, aided by additional briefs and
oral arguments, we think our first view was incorrect.

It is not believed, under the situation attending the disposi-
tion of town lots in the Choctaw and Chickasaw Nations, and
especially pertaining to the treaty rights granted to certain per-
sons of preference right purchasers, that the general rules of
equity as applied, under the general laws enacted in reference
to the disposition by the federal government of its own public
lands to its own citizens, can be resorted to, or that the com-
mission, when it came to decide to whom a lot in controversy
should be awarded, was required, or had in fact the right, to
look elsewhere than to the language and clear intent of the treaty
in determining whether an individual claimant, or, in a contest,
which of the claimants, was entitled to the right of preferential
purchase. In other words, it is thought that in those nations the

question of "previous holding" or former possession of the lot was quite immaterial, as it in no sense entered into or constituted a qualification to become a preferred purchaser under the treaty. A citizen of the United States, or even a member of the tribe, for that matter, might have been penning his herds on one or more of these lots since time immemorial, and without having qualified under the treaty, by placing and owning such improvements on the lot as it contemplated, the lot would have been sold at auction as an unimproved lot, to the highest bidder, quite regardless of the previous holding or former possession. This view probably could not be maintained under the agreements and laws applicable to some of the other tribes in Indian Territory, such as the Cherokee and Creek tribes, and the reasons therefor will be noticed further on.

We are aware that, long before any of the agreements looking to the allotment of their lands, and the segregation of the town sites were made with the civilized tribes of Indians in Indian Territory, towns and villages had sprung up and white people were gradually populating the country; and in dealing with one another, and even with individual members of the tribes, where the tribe or nation was not itself concerned, the courts recognized the possessory rights of those occupying town lots. The early cases are *Kelly et al. v. Johnson et al.*, 1 Ind. T. 184, 39 S. W. 352, and *Walker Trad. Co. v. Grady Trad. Co.*, 1 Ind. T. 191, 39 S. W. 354. But this recognition did not proceed upon the idea that such possessor of a lot had a scintilla of actual title, or at that time any known means of ever acquiring it; but that inasmuch as a member of the tribe, while without any individual title, or the power to acquire such, in any part of the tribal lands, had, when once he went into possession, the right to remain and occupy the land possessed, as against other members of the tribe, when such member delivered to another, even a nonmember of the tribe, his possession of a lot (and this was the practically universal custom), the courts upheld and protected such possession (*Williams v. Works*, 4 Ind. T. 587, 76 S. W. 246), probably for the very good reason that, under the law, no other individual could possibly assert any

superior right in himself to it. It nevertheless is true that in those early days, prior to the adoption of the treaty involved here, nonmembers of the tribe were without any rights, relative to the lands, as between themselves and the tribes.

In *St. L. & S. F. R. Co. v. Pfennighausen*, 7 Ind. T. 689, 104 S. W. 882, Justice Clayton, one of the best informed men of that time on matters peculiarly affecting the civilized tribes of Indians, said:

"Up to the time of the passage of that bill, as between these people and the Creek Nation, they were only squatters and trespassers, without any title, legal or equitable, to the land. But, as between themselves and others dealing with them in relation to the lands having full knowledge of the situation, the courts have always recognized their contracts relating to them."

Prior to the adoption of the various agreements with these tribes, relating to town sites, it cannot be said that the federal government either invited or induced the white man to settle or come upon the Indian lands. The law (section 2118, U. S. Rev. Stat. 1878) was to the contrary. Neither were the tribal governments of the Choctaws and Chickasaws responsible for the white man's coming onto their lands. Their laws and policy were directed, with all the strength they could summon in their weakness, against our coming and possessing their lands (Laws Choctaw Nation, pp. 248, 268, as mentioned in *Walker. Trad. Co. v. Grady Trad. Co., supra*), and yet the white man came and builded towns. The provisions in the treaty, not recognizing rights, but granting rights to the white man, were not to get him to come; but because he had already arrived; and the treaty makers found him here. So much has been said by way of premise, upon which to view the treaty provisions which the town-site commission was called upon, and we in turn are called upon, to construe. When the agreement was being negotiated, the tribes, in their tribal capacity, were the sole and exclusive proprietors of the lands upon which the towns and villages stood. There was not an outstanding right or equity against their proprietorship which they, under the law, were obliged to recognize, or even consider. As against the tribe, the fee owner, no court had ever held, and no law had ever intimated, that any individual had any

right in law or equity he could assert. Like any other proprietor, when they came to make an arrangement, by agreement for the sale of their lands, they had the right to name the terms of its sale; and, if they thought it wise or just to give, as they must have thought, the preference right to any one to buy a specific lot at less than its value, they had the right to arbitrarily determine who it should be. The tribes, through their treaty making agents, well knew the conditions; that white men were in possession of the town lots, unimproved as well as those that were improved. They also knew and recognized that the placing of buildings on lots had increased the value, not only of the lots on which they stood, but of all the vacant lots. It was apparent that this increase of value ought to be accounted an equity lodged in some one. In whom should it be lodged? In the individual, white or Indian, who had merely held possession of lots, and received ground rent for same, which of itself alone added no value to the property? Or should it be to the man who built and owned the improvements, which, aggregated, gave the property value? This question was settled in the agreement. The only parties having the right to say, or even to complain, have said, in language that needs the application of no rules of construction, that the preference right to purchase a lot in a town in one of these nations is in "the owner of the improvements" situated on the lot.

Very little, if anything, can be said of the equities, at least of either of the present parties before the court. Both of them bought their way into a lawsuit; they each had full knowledge of all the facts. Riddle had been an attorney in the litigation. The Johnsons were occupying a part of the lot the year before they purchased, under a written contract of tenancy with Ellis, Riddle's grantor, in which his ownership of the lot seems to be admitted. When the Johnsons purchased, the lot had long since been awarded to Riddle, and the purchase price deposited by him. The controversy was at the time in its initial stages before the Land Office, yet they bought in and took the burden of the contest on their own shoulders. Both parties stand now,

as they have always stood, wagering their money on their judgment as to the outcome of the litigation.

As suggested earlier in this opinion, the agreements made between the federal government and some of the other tribes, relative to the disposition of their town lots, would probably require a different construction. In the agreement with the Cherokees (Act July 1, 1902, c. 1375, 32 St. at L. 716), and that with the Creeks (Act March 1, 1901, c. 676, 31 St. at L. 861), it would seem that the question of "rightful possession," or, in other words, the "previous holding of the lot," would enter as an element into the qualification of a claimant as a preference right purchaser. But those agreements were made long after the one involved here, between other proprietors and the government, and under very different local conditions, at least as to the Cherokees.

We have come to the conclusion that it has not been demonstrated that the department, charged with the decision of this matter, fell into an error of law and, because of such error, awarded the lot in question to the wrong party. This was the holding of the trial court, and we think it clear that the judgment therein rendered should be affirmed.

By the Court: It is so ordered.