## HILL, A MINOR, ET AL. v. REYNOLDS, A MINOR.

### ERROR TO THE SUPREME COURT OF THE STATE OF OKLAHOMA.

No. 61. Argued November 2, 1916.—Decided January 8, 1917.

A decision of the Secretary of the Interior adjudicating a contest over certain Choctaw and Chickasaw lands, and awarding a patent, under the agreement in the Act of June 28, 1898, c. 517, 30 Stat. 505, and the supplemental agreement in the Act of July 1, 1902, c. 1362, 32 Stat. 641, *held*, free from misconstruction or misapplication of law.

The provisions of §§ 17 and 18 of the Act of June 28, 1898, *supra*, inhibiting enclosures and holdings of lands in excess of allottable quantities, were left in force as to the Choctaws and Chickasaws by the agreement in the 29th section which became effective through tribal ratification on August 24, 1898.

Choctaw and Chickasaw lands held by a widow and her minor children in excess of allottable quantities, and bearing certain meager and non-severable improvements, were surrendered by her in January, 1899, for an adequate consideration, to one who took possession, made valuable and lasting improvements and, in December, 1902, sold, maintaining possession meanwhile.

*Held*, (1) That in virtue of these transactions, and by force of §§ 17 and 18 of the Act of June 28, 1898, *supra*, the interests of the children were so devested that an applicant for allotment relying for priority on quitclaims of their rights in the land and improvements, executed in November and December, 1902, could not prevail over a prior applicant who had succeeded to the rights of the widow's surrenderee under his sale.

(2) That the failure of the children's guardian to join in the surrender was immaterial.

Sections 19 to 21 of the Act of July 1, 1902, *supra*, allowing until September 25, 1902, within which to reduce excessive enclosures and holdings, were not intended to permit of the revival and reassertion of long-dormant claims to the prejudice of persons entitled to allotments who had entered into possession and made valuable improvements.

43 Oklahoma, 749, affirmed.

THE case is stated in the opinion.

*Mr. Alger Melton* and *Mr. Joseph W. Bailey*, with whom *Mr. Reford Bond* and *Mr. C. B. Stuart* were on the brief, for plaintiffs in error.

*Mr. F. E. Riddle*, with whom *Mr. Harry Hammerly* was on the brief, for defendant in error.

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is a controversy arising out of conflicting applications for the allotment of four hundred and twenty acres of Choctaw and Chickasaw lands. The lands were subject to allotment and all the applicants possessed the requisite qualifications, so it was merely a question as to who had the better right to select the particular lands. The applicants were minors and are designated in the record as the Reynolds children and the Hill children. The former were the first to apply and the latter instituted a contest which ultimately reached the Secretary of the Interior. That officer sustained the claims of the Reynolds children and patents were issued to them. The Hill children then brought this suit to charge the others as trustees and to compel a conveyance. In the trial court the plaintiffs prevailed, but in the Supreme Court there was a judgment for the defendants. 43 Oklahoma, 749.

The chief contention of the plaintiffs is that the Secretary of the Interior misconstrued the law applicable to the facts conceded and proved and that this resulted in the issue of patents to one set of claimants when the other set was entitled to them. Under a familiar rule, if this were true, the plaintiffs would be entitled to the relief sought. *Ross* v. *Stewart*, 227 U. S. 530, 535. But was there any material misconstruction of the law by the Secretary? We say material misconstruction, because, if

his decision was otherwise right, its force was not lessened by anything he may have said concerning what was not material at the time.

The lands of the two tribes were being allotted in severalty among their members under the agreement set forth in § 29 of the Act of June 28, 1898, c. 517, 30 Stat. 505, and the supplemental agreement embodied in the Act of July 1, 1902, c. 1362, 32 Stat. 641. These agreements defined what should be a standard allotment, entitled each member to such an allotment to be selected by or for him, and permitted the selection to be so made as to include his improvements, if any, but without exceeding a standard allotment. When the conflicting applications therefor were made the lands in controversy were not wild or vacant but improved and occupied, and the issues in the contest all centered about the ownership of the improvements. Both sides claimed to own them and to have in consequence a preferred right of selection.

The facts found by the Secretary of the Interior—and his findings were not without evidence to sustain them—are as follows: These lands were part of a much larger body, containing twelve or fifteen thousand acres, which had been enclosed and occupied by one Campbell in his lifetime. He was a white man who had married into the Chickasaw tribe. Of the lands so enclosed he reduced twelve or fifteen hundred acres to cultivation and used the remainder for pasturing live stock. His dwelling and the improvements connected therewith were upon part of the enclosed lands but not upon those in controversy. He died in 1896 leaving a widow, two married daughters and five minor sons. A guardian for the minors was appointed but permitted matters to drift without any particular control by him. The widow and minor sons continued to occupy the home place, and she, with the guardian's assent, looked after the cultivation and renting of the tillable fields and made some use of the pasture land. In

January, 1899, for a consideration not challenged, she surrendered six hundred and forty acres of the enclosed land, with the improvements thereon, to one Blassingame. This tract embraced the lands in controversy. At that time the improvements on the latter consisted of a surrounding four-wire fence and two or three fields reduced to cultivation—the tillable ground being regarded as an improvement. Blassingame took possession of all the lands now in dispute, ditched a large part of them, brought practically all under cultivation and erected substantial buildings thereon, the estimated cost of this work being $2,500. He remained in possession until December, 1902, and then sold to one Brimmage. Two or three months later Brimmage sold to one Reynolds, who went into possession of all but about eighty acres, presently to be noticed, and afterwards made application for the allotment of the lands to his minor children, the contestees.

At no time during Blassingame's occupancy was there any serious effort by any of the Campbells or by the guardian to dispossess him. By a court decree he and his family had been adjudged to be members of the Chickasaw tribe and were accordingly entitled to share in the occupancy and use of the tribal lands. By a later decree they lost this status, but not until after the sale to Brimmage. The status of the latter, as also that of Reynolds, was such that either could hold whatever passed by Blassingame's sale.

In November and December, 1902, Campbell's widow, three of his sons who then had attained their majority, and the guardian of two of his sons who were still minors, sold and quit-claimed to one Hill all of their rights in the lands in controversy and the improvements thereon. Afterwards Hill made application to have the lands allotted to his minor children, the contestants. His status was such that he could hold whatever he received from the Campbells.

No improvements were added by Hill, save a short and unsubstantial fence, and when the contest was begun he had not been in possession of any part of the lands, save a tract of eighty acres or less. He had been in possession of it less than a year, and had entered without leave and in disregard of such rights as had arisen out of Blassingame's occupancy and improvement for nearly four years. In this way Reynolds was prevented from taking possession of this tract.

The members of the Campbell family all selected and received other lands for their allotments, so none of those in dispute were needed for that purpose.

Upon these facts the Secretary of the Interior concluded that the contestees, the Reynolds children, had the better claim to the improvements and therefore the better right to select the lands for their allotments. In this we perceive neither any misconstruction nor any misapplication of the law. We assume, of course, that upon Campbell's death in 1896 his family succeeded to his rights in these lands, that is, to his possessory claim and his improvements. But at best the improvements were meager, and continued occupancy was essential to sustain the possessory claim. This was the situation when the Act of June 28, 1898, *supra*, came into operation. It not only made provision for the allotment in severalty of the tribal lands, but directed the correction in the meantime of various practices respecting those lands that were deemed particularly objectionable. One of these was the practice of enclosing or holding possession of tribal lands greatly in excess of what would be the approximate or allottable share of the occupant and his family. By its 17th and 18th sections the act provided that after the expiration of nine months from its passage all such enclosures or holdings should be deemed unlawful and that proceedings should be taken to terminate them and to punish the offenders. The agreement set forth in the 29th section became ef-

fective through tribal ratification on August 24, 1898, (238 U. S. 308) and superseded many provisions of the act, so far as the Choctaws and Chickasaws were concerned, but it left the 17th and 18th sections in force as to them and made new and more elaborate provision for allotting their lands in severalty. The enclosure or holding of the Campbell family, embracing as it did twelve of fifteen thousand acres, came within the letter and spirit of the 17th and 18th sections; for, as was pointed out by the Secretary of the Interior, that acreage was several times greater than the approximate or allottable share of all the members of the family including the two married daughters. Thus it was essential that a considerable portion of the holding be surrendered, and the time for doing this was limited. The widow was the head of the family and apparently its only active agent. The guardian was inactive, and, besides, under the statute, 30 Stat. 507, the widow was to have precedence over him in selecting the lands to be allotted to the minor children. She therefore was in a position to exercise a real voice in determining which lands should be surrendered and which retained. It was in these circumstances that she surrendered to Blassingame the lands in controversy with the meager improvements thereon. Presumably the consideration was adequate, for no objection on that score was made. He went into possession in evident good faith and there was no real effort to disturb him. He made extensive, lasting and valuable improvements, the ownership of which plainly was in him. Upon no permissible theory did the Campbells have any right to them, legal or equitable, for they were made after the Campbell occupancy ended and at a time when its continuance would have been unlawful. By comparison the original improvements made by Campbell were inconsiderable, if not entirely negligible, and were such that they could not well be retained after the lands were surrendered. It follows

that Reynolds succeeded to the rights of Blassingame and that Hill took nothing by his purchase from the Campbells, made after Blassingame had been in possession almost four years, because they were then without any interest in the lands or the improvements.

But it is urged that §§ 19 to 21 of the supplemental agreement set forth in the Act of July 1, 1902, *supra*, permitted excessive enclosures or holdings to be reduced or corrected at any time within ninety days after its final ratification, which was on September 25, 1902, when Blassingame had been in undisturbed possession for considerably more than three years. Upon this point the Secretary of the Interior was of opinion that the agreement of 1902 "was certainly not intended to permit Indian citizens to revive and reassert claims long dormant, after others had entered into possession of and highly improved the lands." We concur in that view.

What we have said sufficiently covers the rulings of the Secretary of the Interior upon the questions of law which were material to the contest in hand. Criticism is made of some observations in his opinion upon other questions, but they need not be noticed here.

*Judgment affirmed.*