### TURNER et al. v. OLD HOMESTEAD CO. et al.

No. 7441—Opinion Filed Jan. 8, 1918.

Rehearing Denied Feb. 26, 1918.

(170 Pac. 904.)

(Syllabus.)

**1. Indians—Title to Town Lots—Payment—Statute.**

No title was acquired in town lots in the Creek Nation by the owner of the permanent improvements thereon, until the payment in full of one-half of the appraised value and the execution of a deed to such purchaser, as provided in section 15 of the Curtis Act (Act June 28, 1898, c. 517, 30 Stat. 495, 500), requiring the payment by the owner of the permanent improvements upon any town lot in the Creek Nation of one-half of the appraised value thereof, payable "ten per centum within two months and fifteen per centum more within six months after notice of appraisement, and the remainder in three equal annual installments thereafter," and providing that such deposit should "be deemed a tender to the tribe of the purchase money for such lot," and which also provided that "the person authorized by the tribe or tribes may execute or deliver to any such purchaser, without expense to him, a deed conveying to him the title to such lands or town lots."

**2. Same—Town Lots — Owner of Improvements—Title—Act of Congress.**

The executor of the last will and testament of such deceased owner of improvements acquired no title, legal or equitable, or vested right in such lots, by virtue of having made, for the use and benefit of the estate, the two initial payments thereon, as provided in section 15 of the act. Hence it was within the power of Congress, acting for and in conjunction with the Creek Nation to subsequently provide, as it did, in the Original Creek Agreement (Act March 1, 1901, c. 676, § 11, 31 Stat. 861), that the title to town lots should be awarded to "any person in rightful possession" of any town lot having improvements thereon, and not to "the owner of the improvements," as provided in section 15 of the Curtis Act.

### 3. Same—Title of Surviving Wife.

A title acquired by the surviving wife of a testator (who died seised of permanent improvements on town lots in the Creek Nation), by the exercise of the preferential right of purchase conferred by the Original Creek Agreement (section 11) upon "any person in rightful possession of any town lot having improvements thereon, other than temporary buildings, fencing, and tillage," will not be impressed with a trust in favor of remaindermen or their heirs under the will, on account of partial payments by the executor of one-half of the appraised value of the lots under section 15 of the Curtis Act, particularly where, after the passage of the Creek Agreement, the executor abandoned all further claim to the lots under the provisions of the will, and was thereafter reimbursed by the surviving wife and occupant of the premises for the installments of the purchase price paid.

### 4. Same—Rights—Statute.

The privilege given the owner of improvements on town lots accorded by section 15 of the Curtis Act, except such as coincided with the rightful occupancy of such lots, terminated upon the taking effect of the Original Creek Agreement on May 25, 1901, or, at least, where, subsequent to the ratification of said agreement, the executor of the will of the deceased owner abandoned the proceedings theretofore instituted for the acquisition of title for the beneficiaries under the will, and was reimbursed by the rightful occupant of the lots for the payments made; such occupant having the preferential right to acquire title under the subsequent Creek Agreement.

Error from District Court, Muskogee County; R. P. De Graffenried, Judge.

Suit by Clarence W. Turner and others against the Old Homestead Company and others. Decree for defendants Fred E. Turner and others, and plaintiffs and defendants Metropolitan Trust Company and Tookah T. Bagg, nee Turner, bring error. Affirmed.

Charles F. Runyan, John D. De Bois, and Chas. Bagg, for plaintiffs in error.

Zevely, Givens & Stoutz, for defendants in error.

SHARP, C. J. On the 14th day of April, 1913, the plaintiffs, Clarence W. Turner, Clarence W. Turner, Jr., Marion E. Turner, by Clarence W. Turner, her next friend, J. A. Kirkwood, Effie T. Kirkwood, Fred Kirkwood, a minor, and Raymond Kirkwood, a minor, by J. A. Kirkwood, their next friend, brought suit in the district court of Muskogee county against Fred E. Turner, Gunter N. Turner, the Old Homestead Company, Metropolitan Trust Company, James M. Givens, Julia A. Turner, and Tookah T. Bagg, nee Turner, for the purpose of obtaining a decree declaring certain of the defendants named to be trustees for the plaintiffs in respect to the title to certain valuable business lots in the city of Muskogee, and which lots constituted a part of the town site of the former town of Muskogee, Creek Nation, Indian Territory. In their petition plaintiffs undertook to establish their claim as remaindermen and heirs of deceased remaindermen through and under the last will and testament of John E. Turner, deceased, executed November 4, 1898, and which will was afterwards duly proven and admitted to probate on December 15, 1898; the said John E. Turner having departed this life on the 10th day of December, 1898. In the will, among other things, it was provided that Julia A. Turner, wife of testator, should have a life estate in "all of my improvements on real estate in the town of Muskogee, Indian Territory, together with all my right title and interest in and to the land on which the same are situated," and to have the use of the rents and profits arising therefrom, with remainder over at her death to the seven grandchildren of testator, being the children of Clarence W. Turner, son, and Effie T. Kirkwood, daughter, of said John E. Turner.

Prior to the institution of the suit, Dee W. Turner and Turner Kirkwood died intestate. The surviving grandchildren, together with the heirs at law of those deceased (save Tookah T. Bagg, nee Turner, named as defendant) were plaintiffs in the trial court, and together with Tookah T. Bagg, nee Turner, and Metropolitan Trust Company, appear as plaintiffs in error in this court.

John E. Turner was not a member of the Creek Tribe of Indians. He was, both on the date of the execution of his will and at the time of his death, the owner of improvements on certain lots in the town of Muskogee, Indian Territory. At the time of the making of the will the Curtis Act (Act June 28, 1898, c. 517, 30 Stat. 495), was in force in the Creek Nation. Paragraph 15 thereof provided that the owner of substantial improvements upon any town lot might deposit in the United States treasury, St. Louis, Mo., one-half of the appraised value of such lot or lots, payments to be made as follows: Ten per centum within two months and 15 per centum additional within six months after notice of appraisement, the remainder in three equal annual installments thereafter—and that such deposits should be deemed a tender to the tribe of the purchase money for such lots. It was further provided in said paragraph that, upon the execution and delivery of a deed to such owner of improve

ments by some person authorized by the tribe conveying to him the title to such lands or town lots, the purchase money should thereupon become the property of the tribe. Pursuant to the further provisions of said section, a commission was appointed for the town site of Muskogee, which commission caused said town to be surveyed, platted, and laid out as a town site, and the lots therein to be appraised as authorized by the terms of the act. It appears that the lots in question were listed to Clarence W. Turner, executor of the last will and testament of John E. Turner, deceased, and that, as such executor, he made the two initial payments, required to be made, on September 24, 1900, and January 5, 1901, respectively. It further appears that later on, and in the month of October, 1901, the executor abandoned all further claim on behalf of the estate to the lots, upon which the previous installments of the purchase price had been paid, whereupon, the Town-Site Commission listed the lots in question to Julia A. Turner. This was done with the knowledge and at least the tactic consent of the executor and who was thereafter reimbursed by Julia A. Turner for the funds of the estate theretofore advanced by him on account of the part payment on the lots. Afterwards, and in due course of time, Julia A. Turner paid the three remaining annual installments of the purchase price, and on January 22, 1902, and October 15, 1904, respectively, patents to said lots were duly executed by the Principal Chief of the Creek Nation, which patents were thereafter duly approved by the Secretary of the Interior. It is the action of the Town-Site Commission, subsequently approved by the Secretary of the Interior, in awarding the title to the lots to Julia A. Turner in her own right, that gave rise to the present suit. The grounds for equitable intervention, as charged in the plaintiffs' petition, are that the patentee fraudulently represented to the Town-Site Commission that she was the owner of the improvements upon the lots, "and of the occupancy rights thereof, absolutely and in her own right, and that therefore she was entitled to purchase the said property from the said Creek Nation at one-half of the appraised value and entitled to a patent therefor," and the further ground that the Town-Site Commission misconstrued the rights of said Julia A. Turner to said property under the terms of the will of her deceased husband, and in relying upon a purported invalid decree of the United States court to the effect that the lots in question were personal property and not realty, and "by an erroneous construction of the law." The charge of fraud on the part of Julia A. Turner, or

her agent, Fred E. Turner, may be quickly disposed of, as the same is obviously without foundation in fact, and that whether the fraud relied on be actual or constructive.

Treating the allegations of the petition as sufficient to tender the issues that the officers of the Department of the Interior committed a clear error of law in awarding the preferential right of purchase, and ultimately in issuing the patent to the wrong party, a more difficult question for determination is presented. The power of the courts generally in such cases is well settled. Citizens' Trading Co. v. Bass, 30 Okla. 747, 120 Pac. 1095; Ross v. Day, 29 Okla. 186, 116 Pac. 949, affirmed in 232 U. S. 110, 34 Sup. Ct. 233, 58 L. Ed. 528; Johnson v. Riddle, 41 Okla. 759, 139 Pac. 1143, affirmed in 240 U. S. 467, 36 Sup. Ct. 393, 60 L. Ed. 752; Reynolds v. Hill, 43 Okla. 749, 143 Pac. 1155, affirmed in 242 U. S. 361, 37 Sup. Ct. 163, 61 L. Ed. 363.

It may be considered that originally the improvements upon the lots constituted personal property and belonged to the estate; also that, under the terms of the Curtis Act, the owner of the improvements, upon the payment in full of one-half of the appraised value thereof, was entitled to have the same "deemed a tender to the tribe of the purchase money for such lot." This, however, fell far short of passing to the executor any title, equitable or legal, in the lots. It was only when "the person authorized by the tribe or tribes" executed to him a deed conveying the title thereto that any right, legal or equitable, passed. Until this was done the making of the payments constituted, under the very terms of the act, a tender only. On March 1, 1901, Congress passed an act to ratify an agreement with the Creek Nation (31 Stat. 861, 866), which act was ratified by the Creek people May 25th following. That act, commonly known as the Original Creek Treaty, dealt at considerable length with the rights of the owners of both improved and unimproved town lots in the towns of the Creek Nation. Paragraph 11 thereof provided that any person in rightful possession of any town lot, having improvements thereon, other than temporary buildings, fencing, and tillage, should have the right to purchase such lot by paying one-half of the appraised value thereof; section 12, that any person having the right of occupancy of a residence or business lot in any town, whether improved or not, and owning no other lot or land therein, should have the right to purchase such lot by paying one-half of the appraised value thereof; section 13, that any person holding land within a town, occupied by him as a home, as also any per-

son who had at the time of the signing of the treaty, purchased any lot, tract, or parcel of land from any person in legal possession at the time, should have the right to purchase the lot embraced in same by paying one-half of the appraised value thereof—such land, however, not to exceed four acres in extent. The same right seemingly was given to the occupant of unimproved lands within Creek town sites.

From the foregoing it appears to have been the purpose of the contracting parties to confer the preferential right to purchase, not upon the owner of the improvements, as was the case in the Atoka Agreement of April 23, 1897, with the Chickasaw and Choctaw Nations (30 Stat. 495, 505, c. 517, par. 29), but upon the rightful occupant. It may be conceded at the outset that whenever, in pursuance of the legislation of Congress, rights have become vested, it becomes the duties of the courts to see that those rights are not impaired. Garfield v. U. S. ex rel. Goldsby, 211 U. S. 249, 29 Sup. Ct. 62, 53 L. Ed. 168; Ballinger v. U. S. ex rel. Frost, 216 U. S. 240, 30 Sup. Ct. 338, 54 L. Ed. 464. If, however, it can properly be said that the estate, on account of the making of the initial payments by the executor, acquired no valid interest in the lots, then it was within the power of the Creek Nation, with the consent and approval of Congress, to alter or withdraw the offer made in the first instance. That a treaty may supersede a prior act of Congress and an act of Congress supersede a prior treaty is elementary. The Cherokee Tobacco Case, 11 Wall. 616, 20 L. Ed. 227; Thomas v. Gay, 169 U. S. 264, 18 Sup. Ct. 340, 42 L. Ed. 740; Lone Wolf v. Hitchcock, 187 U. S. 553, 23 Sup. Ct. 216, 47 L. Ed. 299; Williams et al. v. Johnson, 32 Okla. 247, 122 Pac. 485, affirmed in 239 U. S. 414, 36 Sup. Ct. 150, 60 L. Ed. 358.

In Wallace v. Adams, 143 Fed. 716, 74 C. C. A. 540, it was said that the jurisdiction of the Dawes Commission and the Secretary of the Interior, and the effect of their action in the allotment of lands of the Choctaw and Chickasaw Nations were the same in effect as the jurisdiction and effect of the action of the Land Department of the United States in the disposition of the public lands within its control; that the Commission, under the direction of the Secretary, constituted a special tribunal vested with the judicial power to hear and determine the claims of all parties to allotments of the lands of the Five Civilized Tribes, and to execute its judgment by the issuance of allotment certificates, which constituted conveyances of the right to the lands to the parties who it decided

were entitled to the property. The rule may be applied with equal force in cases arising out of the various acts and agreements respecting the sale of town lots on the tribal lands of the Five Civilized Tribes. Turning to the opinions in cases growing out of the action of the Land Department of the general government in the disposition of the public lands, may be found many authorities that are helpful in reaching a correct conclusion of the case under consideration. Among them are Rector v. Ashley, Executrix, 73 U. S. (6 Wall.) 142, 18 L. Ed. 733, in which it was held that, under the New Madrid Act, a claimant acquired no vested interest in the land until surveyed by the officers of the government and until that survey was filed in the office of the recorder and approved by him. There the point was stressed that, as the applicant had done all he could do to make good his claim to the land when he had deposited with the surveyor his certificate of loss with a description of the land desired in exchange, he had thus acquired an equitable interest in the land so described, which the United States could not divest him of and grant to another. It was answered by the court that the rights of the claimant were to be measured by the acts of Congress, and not exclusively by what he might or might not be able to do, and if a sound construction of the act showed that he acquired no vested interest in the land until the officers of the government had surveyed the land, and until that survey was filed in the office of the recorder and approved by him, then, as claimant's rights were created by the statute, they must be governed by its provision, whether they be hard or lenient. This, in view of the previous opinions of the court (Bagnell v. Broderick, 13 Pet. 436, 10 L. Ed. 235; Barry v. Gamble, 3 How. 32, 11 L. Ed. 479; Lessieur v. Price, 12 How. 60, 13 L. Ed. 893), reviewed in the opinion, it was said, seemed clear.

In a leading case (Frisbie v. Whitney, 76 U. S. [9 Wall.] 187, 19 L. Ed. 668), it was said that the settlement on the public land of the United States, no matter how long continued, conferred no right against the government; that the land continued subject to the absolute disposing power of Congress until the settler had made the required proof of settlement and improvements and had paid the requisite purchase price. The opinion is a very instructive one, and while it recognizes that the courts may very properly correct injustice done by the land offices in refusing to accord rights, however inchoate, which are protected by laws which are still in existence, they can only consider vested

rights when those rights are sought to be enforced in opposition to the repeal or modification of the laws on which they are founded. To the same effect is Campbell v. Wade, 132 U. S. 34, 10 Sup. Ct. 9, 33 L. Ed. 240. There the court called attention to the fact that the adjudications were numerous where the withdrawal from sale by the government of lands previously opened to sale had been adjudged to put an end to proceedings instituted for their acquisition. Speaking of the pre-emption laws of the United States, it was said that it had always been held that occupation and improvements of the lands desired with a view to pre-emption, though absolutely essential to that purpose, did not confer upon the settler any right in the land occupied as against the United States, which could impair in any respect the power of Congress to withdraw the land from sale for the uses of the government, or to dispose of the same to other parties. It was there held that the act withdrawing the lands from sale was equivalent to a repeal of the act authorizing the sale, but that no vested right was thereby impaired, and could not be until after the settler had done everything required by law to secure such right. Until then no contract could arise in any way binding upon the state, and hence no such right was violated by the subsequent act.

As section 15 of the Curtis Act amounted to but a tender of the appraised value, with an option on the part of the tribe to accept the same by the execution of a deed, the Creek Nation, at least prior to making of the payments by the owner of the improvements and their acceptance by it, was clearly within its rights when by the original agreement the preferential right of purchase was given the "person in rightful possession," without regard to the ownership of the improvements. This principle is well supported by the authorities cited. True it is that as to all others than the sovereignty the owner of the improvements would be entitled to protection from intrusion upon the improved premises and to have redress for an invasion of his rights of occupancy. But the act conferred upon such owner no vested right to acquire the title to the lots upon which the improvements were situated, as, at the time of his death, Turner had no vested interest in the title to the lots, even though his ownership of the improvements be undisputed. Tuttle v. Moore, 3 Ind. T. 712, 64 S. W. 585; Zevely et al. v. Weimer, 5 Ind. T. 646, 684, 82 S. W. 941; W. O. Whitney Lbr. & Gr. Co. v. Crabtree, 166 Fed. 738, 92 C. C. A. 400. In such circumstances he could devise no greater

interest in the lots, considered apart from the improvements, than he himself owned.

The power exercised and authorizing the acquisition of title to improved town lots in the Creek Nation was plenary on the part of the contracting parties, and to that end they could use any reasonable means in the awarding of titles in the town sites set apart from allotment. If the result of one measure was not satisfactory, another could be tried. The fact that certain privileges were afforded under the terms of the Curtis Act did not, at least under the facts presented in the case at bar, exhaust the power of the Creek Nation, acting in concert with Congress, to require further or different provisions in respect thereto, so long as vested rights had not attached. Like other tribal Indians, the Creeks were wards of the United States, which possessed the power, if it deemed such course advisable, to assume full control over them and their affairs and to distribute the lands and funds among them and terminate the tribal government. This is what Congress undertook to do.

In Sizemore v. Brady, 235 U. S. 441, 35 Sup. Ct. 135, 59 L. Ed. 308, the claim was made that, under the provisions of the original agreement relating to the allotment and distribution of tribal lands and funds, the rights of maternal cousins were in the nature of a grant in praesenti, and invested every living member of the tribe and the heirs designated in the tribal laws with an absolute right to an allotment of lands and a distributive share of the funds, and that Congress could not recall or impair this right without violating the due process of law clause of the Fifth Amendment to the Constitution. In the opinion the court held that no rights were conferred under the terms of the original Creek Agreement which could not be changed by subsequent legislation; that the power of Congress was not exhausted or restrained by the adoption of the original agreement, but remained the same thereafter as before, save that rights created by carrying the agreement into effect could not be divested or impaired; also that the lands and funds to which the treaty related were tribal property, and only as it was carried into effect were individual claims to be fastened upon them. Unless and until that was done, Congress possessed plenary power to deal with them as tribal property; it could revoke an agreement and abandon the purpose to distribute them in severalty, or adopt another mode of distribution, or pursue any other course which it deemed better for the Indians. Further, it was said to have been contemplated that various pre-

liminary acts would precede any investiture of individual rights. That it was within the power of Congress to effect a change in the administrative control of the government over tribal property of tribal Indians at any time before it was carried into effect, and while the tribal relations continued, was announced in Stephens v. Cherokee Nation, 174 U. S. 445-448, 19 Sup. Ct. 722, 43 L. Ed. 1041; Cherokee Nation v. Hitchcock, 187 U. S. 294, 23 Sup. Ct. 115, 47 L. Ed. 183; Wallace v. Adams, 204 U. S. 415-423, 27 Sup. Ct. 363, 51 L. Ed. 547-551.

The acts of Congress and agreements with the tribes, providing for the allotment of the lands of the Creek Nation and the awarding of titles to the lots in the town sites set apart under lawful authority was, to a very considerable extent, an experiment. The undertaking was full of complexities and numerous difficulties were encountered in effecting a just and salutary settlement of the rights of the citizens and those claiming to be such, and in the devising of a plan whereby both citizens and noncitizens, occupants of or the owners of improved property in the town sites, should be given certain preferential rights in the final partitioning of that large and rich estate. Sizemore v. Brady, supra; Woodward v. De Graffenried, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310; Gritts v. Fisher, 224 U. S. 640, 32 Sup. Ct. 580, 56 L. Ed. 928. The temporary nature of the Curtis Act, as it affected the conditions existing in the Creek Nation, is well illustrated when it is remembered that the allotment provisions thereof only authorized the Dawes Commission to allot "the exclusive use and occupancy of the surface" of all tribal lands susceptible of allotment, and that no provision was made for extinguishing the tribal title thereto. It was only by virtue of subsequent agreements that authority is found for acquiring a title in the fee. It will be remembered, too, that at the time of the passage of the original Curtis Act, Congress entertained serious doubts as to its constitutional power to interfere with the tribal lands of the Five Civilized Tribes, or to overthrow the tribal governments without the consent of the Indians. Some of the doubts were afterwards resolved by the decisions of the Supreme Court in Stephens v. Cherokee Nation, 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041, and Cherokee Nation v. Hitchcock, 187 U. S. 294-304, 23 Sup. Ct. 115, 47 L. Ed. 190.

From what has been seen it follows that, as the estate of John E. Turner had or acquired no vested rights or interest in and to the lots scheduled to the estate by the making of the first two payments, the power remained in Congress, acting for and in behalf of the Creek Nation and with its consent, to change the law, either by subsequent act of Congress or by treaty provisions, so as to give to another a preferential right in acquiring title to town lots, which yet remained a part of the tribal lands of the Creek Nation. The original Creek Treaty, under which title was acquired, conferred upon the person in rightful possession of any improved town lot and not upon the owner of the improvements, the preferential right of purchase. This we have already seen is expressed in different provisions of the agreement. That Julia A. Turner was the rightful occupant of the lots in question is not made an issue; in fact, her possession at the time is averred in the plaintiffs' petition, and is, as we understand, conceded. The right of an occupant of improved town lots in rightful possession thereof has been recognized in the following cases: Fawcett v. Hill, 29 Okla. 461, 118 Pac. 132; Kelman v. Kennedy, 31 Okla. 61, 119 Pac. 1000; U. S. v. Rea-Read Mill & Elevator Co. (C. C.) 171 Fed. 501; Johnson v. Riddle, 41 Okla. 759, 139 Pac. 1143. The latter case was affirmed on appeal to the Supreme Court of the United States, 240 U. S. 467, 36 Sup. Ct. 393, 60 L. Ed. 752. In that case the Atoka Agreement, as has already been briefly noted, gave the owner of the improvements on town lots the preferential right to purchase such lots. Riddle was the owner of the improvements, though prior to his act of filing upon the lot he occupied the same as a tenant. It was urged that under such circumstances his ownership of the improvements should not confer upon him the preferential right of purchase. Answering the contention, the court said:

"The lease created a mere estoppel between trespassers. The rights, if they may be called rights, of lessor and lessee alike, were terminated by the force of the agreement. Individual ownership of the land originated with that instrument, and can be only such as by its terms were created. It was competent for Congress, or for the Indian Tribes, with the concurrence of Congress, to deal as they deemed proper with the practical situation resulting from the building of towns by white men within their borders. They chose to confer a preferential right of purchase, at a discount from the appraised value, not upon the 'occupant,' or 'possessor,' or 'landlord,' or 'tenant,' but upon 'the owner of the improvements' other than those of a temporary nature. This did not cut off any pertinent equity, but it rendered all equities impertinent except such as related to the improvements."

The Atoka Agreement, while accepting existing improvements of a substantial nature as part consideration for the purchase of town lots in the Choctaw and Chickasaw Nations, contained no recognition of legitimacy in the previous occupation of the soil by white men, nor any official ratification of their intrusion upon the Indian lands. It laid aside, as immaterial, the question whether improvements had been constructed with or without rightful possession of the land. In this respect it differed from the Original Creek Agreement of March 8, 1900 (Act March 1, 1901, c. 676, 31 Stat. 861), the proposed Cherokee Agreement of April 9, 1900 (Act March 1, 1901, c. 675, 31 Stat. 848, 853), which failed of ratification by the tribe (8th Ann. Rep. Dawes Comm. Oct. 1, 1901; House Doc. No. 5, 57 Cong. 1st Sess. vol. 24, p. 11), and the Cherokee Agreement of July 1, 1902 (chapter 1375, 32 Stat. 716, 723), which was ratified by the tribe (10th Ann. Rep. Dawes Comm. Sept. 30, 1903; House Doc. No. 5, 58th Cong. 2d Sess. vol. 20, p. 115).

Applying the rule announced in the foregoing opinion, and keeping in mind the provisions of the Original Creek Agreement giving the preferential right of purchase to the rightful occupant, it appears obvious that Julia A. Turner was lawfully entitled to the patents subsequently issued to her, and hence no error of law was committed by the officers of the Interior Department. Indeed, any other conclusion would be to disregard the plain mandate of the Creek Agreement. Whether or not, after said agreement became effective, the Townsite Commission in listing the property to Julia A. Turner, in her own right and in canceling its former action in listing the lots in the name of the estate of John E. Turner, deceased, was influenced by the decrees of the United States court at Muskogee or by the subsequent opinion of the Indian Territory Court of Appeals in Turner v. Turner, 3 Ind. T. 582, 64 S W. 543, is unimportant. Even though established (which may well be doubted), the Commission only did what the law required should be done. It also follows that the validity of the judgments and decrees both on the probate and and chancery side of the docket of the United States court at Muskogee, are without force in determining the ultimate right of the proper authorities of the Interior Department in awarding the title to the improved lots to Julia A. Turner. That she was at all times in the rightful possession of the improved lots was never questioned, and such being the case any judgment or decree determinative of the character of the improvements, whether personal or real, was foreign to the one necessary question, that of rightful occupation of lots having substantial improvements thereon. The fact that the trial court reached a correct conclusion through a different process of reasoning, or that it considered as important unimportant facts, or that it rested its conclusion on different principles of law, is inconsequential, where, as here, it clearly appears that plaintiffs were without right in the premises.

The judgment of the trial court is affirmed.

All the Justices concur.